**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| TEX TIN CORPORATION | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-96-247 |
| | § | |
| UNITED STATES OF AMERICA | § | |
| | § | |
| Defendant, | § | |
| | § | |
| | § | Consolidated with |
| | § | |
| TEX TIN SETTLING DEFENDANTS | § | |
| STEERING COMMITTEE, | § | |
| | § | |
| Plaintiffs, | § | CIVIL ACTION NO. G-96-272 |
| | § | |
| GREAT LAKES CARBON | § | |
| CORPORATION; HONEYWELL | § | |
| INTERNATIONAL, INC; BAYER USA, | § | |
| INC.; OXYDE CHEMICALS, INC.; AND | § | |
| TEXAS PETROCHEMICALS | § | |
| CORPORATION, | § | |
| | § | |
| Defendants. | § | |

**ORDER GRANTING DEFENDANTS OXYDE CHEMICALS, INC. AND OXYDE
CHEMICALS, B.V.'S MOTION FOR SUMMARY JUDGMENT**

This lawsuit arises out of the contamination of a large tin smelter site in Texas City, Texas.

The Tex Tin Settling Defendants Steering Committee ("TTSDSC"), the United States, and others paid

for the remediation of the site, and the TTSDSC now seeks contribution from Oxyde Chemicals, B.V.

and Oxyde Chemicals, Inc. (collectively "Oxyde Defendants"), among others, for the costs paid. Now

before the Court is the Oxyde Defendants' Motion for Summary Judgment. For the following

reasons, the Oxyde Defendants' Motion is **GRANTED**, and all claims against the Oxyde Defendants are hereby **DISMISSED WITH PREJUDICE**.[1]

## I.  Background

This lawsuit arises out of the contamination of a large tin smelter site in Texas City, Texas. TTSDSC now seeks contribution from the Oxyde Defendants, among others, for the costs paid for the remediation and clean-up of the Tex Tin site.  Neither Oxyde Chemicals, B.V. nor Oxyde Chemicals, Inc. shipped any contaminated materials to the Tex Tin site.  Their potential liability, if any, rests on whether Oxyde Chemicals, B.V.  ("Oxyde") is the successor in interest to Oxyde Maatschappij voor Ertsen en Matalen, B.V. ("OMEM"), a Netherlands-based corporation that manufactured and delivered contaminated tin residue to the Tex Tin site from approximately 1974 to 1976.

OMEM was organized in the Netherlands in 1922 for the purpose of trading in ores and metals.  At various times from 1974 to 1976, OMEM sold and shipped partially processed tin ore or tin residue to the Tex Tin site.  The tin residue contained arsenic, lead, and zinc.  At some point prior to 1979, OMEM started a chemicals trading division, which it operated separately from the metals and ores trading business.[2]  There is no evidence in the summary judgment record that the chemicals division played any role or had anything to do with the sale and/or shipment of tin residue or tin ore to the Tex Tin site.

---

[1]The Court does not consider this Order worthy of publication.  Accordingly, it has not requested and does not authorize publication.

[2]The precise year in which the chemicals division began was not provided in any of the exhibits submitted by the Parties, but there was uncontroverted evidence in the summary judgment record that the chemicals division was in existence by 1979.

In June 1985, OMEM sold the name "Oxyde" and its chemical division to Oxyde Chemicals, B.V., a Netherlands-based trading company. This sale did not include any part of the business that had engaged in the sales and shipments of tin residue. Upon the sale of the chemicals trading business to Oxyde Chemicals, B.V., OMEM changed its name to Asoma Netherlands, B.V. ("Asoma"), which reflected its ownership by Asoma Corporation. Asoma continued the metals and ores trading business of OMEM. Asoma was liquidated on November 28, 2003.

The sale of the chemicals division to Oxyde Chemicals, B.V. was an arms-length, negotiated transaction. There was no continuity or commonality of ownership between Oxyde Chemicals, B.V. and OMEM or Oxyde Chemicals, B.V. and Asoma either before or after the purchase of the chemicals division in 1985. Oxyde Chemicals, B.V. did not assume any liabilities of OMEM other than trade liabilities related to the chemicals trading business. At that time, it had no knowledge of any possible liabilities relating to the ores and metals trading business, and there is nothing in the summary judgment record that could be interpreted as either an express or implied assumption of such liabilities.

Oxyde Chemicals, B.V. did purchase assets from OMEM in connection with the purchase, but those assets were from the chemicals division and not the ores and metals division. It also re-employed former chemical division employees of OMEM who were terminated when the sale took place. None of the employees came from the ores and metals trading business.

Oxyde Chemicals B.V. was incorporated in 1985 for the purpose of trading in chemicals, and to this day has continued trading in chemicals and plastics only. Oxyde Chemicals, Inc. was incorporated in 1987 in the United States as a wholly-owned subsidiary of Oxyde Chemicals, B.V. It also has engaged in the business of trading chemicals and plastics only. In 1999, Oxyde Chemicals,

Inc. was sold to new owners, and Oxyde Chemicals, B.V. retained only a 25% ownership interest.

On February 17, 2006, the Oxyde Defendants filed this Motion for Summary Judgment, arguing that neither one is the successor corporation of OMEM, and that they did not assume any of the liabilities of OMEM except those trade obligations involved in the on-going operations of the chemicals trading business.  All claims by TTSDSC for contribution are defeated if the Oxyde Defendants are not the successors in interest of OMEM's metals and ores trading division.  The Court finds that none of the material facts are disputed, and that the issues before it are ripe for summary adjudication.

## II.  Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552–53, 91 L. Ed. 2d 265 (1956).  The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must come forward with "specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  The court must view all evidence in the light most favorable to the non-movant.  *See, e.g.*, *Broussard v. Parish of Orleans*, 318 F.3d 644, 650 (5th Cir. 2003), *cert. denied* 539 U.S. 915, 123 S. Ct. 2276, 156 L. Ed. 2d 130 (2003).

If the evidence would permit a reasonable fact finder to find in favor of the non-moving party, summary judgment should not be granted.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252, 106 S. Ct. 2512.  Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact.  *See id.* at 255, 106 S. Ct. at 2513.

### III.  Successor Liability Under CERCLA

TTSDSC seeks to hold the Oxyde Defendants liable for a portion of the remediation costs of the Tex Tin site pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq. ("CERCLA").  To do so, the Oxyde Defendants must be deemed the successor corporations to the metals and ores trading division of OMEM.

In 1980, Congress enacted CERCLA "in response to the serious environmental and health risks posed by industrial pollution."  *United States v. Bestfoods*, 524 U.S. 51, 55, 118 S. Ct. 1876, 1881, 141 L. Ed. 2d 43 (1998) (citing *Exxon Corp. v. Hunt*, 475 U.S. 355, 358–59, 106 S. Ct. 1103, 1107–08, 89 L. Ed. 2d 364 (1986)).  CERCLA imposes the costs of the cleanup of hazardous wastes on "*everyone* who is potentially responsible for [the] contamination."  *See id.* at 56 n.1, 106 S. Ct. at 1881 (quoting *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 21, 109 S. Ct. 2273, 2285, 105 L. Ed. 2d 1 (1989) (plurality opinion of Brennan, J.) (emphasis in original)).  Despite its comprehensive nature, CERCLA is far from a "model of legislative draftsmanship," leaving open several key aspects of corporate liability.  *Hunt*, 475 U.S. at 363, 106 S. Ct. at 1109.  As relevant to the instant case, CERCLA fails to expressly address what principles should govern the issue of corporate successor liability.  *See United States v. General Battery Corp.*, 423 F.3d 294, 298 (3d Cir. 2005) (citations omitted).   For example, it does not provide rules for determining the liability of a company that has

acquired some or all of the assets of a predecessor company for the environmental response costs that would be attributable to such predecessor. *See id.* Additionally, neither the Supreme Court nor the Fifth Circuit have ever directly addressed the issue of corporate successor liability. *But see Bestfoods*, 524 U.S. at 61–64, 118 S. Ct. 1884–87  (applying rules borrowed from the general common law to the question of parent-subsidiary liability under CERCLA). Therefore, the Court must look to outside Circuits for guidance.

The Circuit Courts that have addressed the issue of corporate successor liability under CERCLA are unanimous in holding that it exists. *See General Battery Corp.*, 423 F.3d at 298 n.3; *New York v. National Service Indus., Inc.*, 352 F.3d 682, 684–85 (2d Cir. 2003); *United States v. Davis*, 261 F.3d 1, 54 (1st Cir. 2001); *N. Shore Gas Co. v. Salomon, Inc.*, 152 F.3d 642, 649 (7th Cir. 1998); *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 364 (9th Cir. 1997);*United States v. Mex. Feed & Seed* Co., 980 F.2d 478, 486 (8th Cir. 1992); *United States v. Carolina Transformer Co.*, 978 F.2d 832, 837 (4th Cir. 1992); *Anspec v. Johnson Controls, Inc.*, 922 F.2d 1240, 1245 (6th Cir. 1991). Additionally, recent courts that have addressed the issue hold that the issue of corporate successor liability is a matter of uniform federal law and is not to be decided according to the law of the particular state where the lawsuit arose, nor should courts apply special rules adopted only for use in CERCLA cases. *See General Battery Corp.*, 423 F.3d at 298-305; *National Service Indus., Inc.*, 352 F.3d at 687 (rejecting use of the substantial continuity/continuation of enterprise doctrine of corporate successor liability because it is not part of general federal common law). *See also Bestfoods*, 524 U.S. at 61–64 (applying general corporate common law principles to the issue of parent/subsidiary liability under CERCLA). *But see Davis*, 261 F.3d at 54 (applying state law to the determination of successor liability).

Federal Circuit Courts vary to some degree on the precise standard to be applied in determining successor liability, and the Oxyde Defendants and TTSDSC advocate that the Court apply two different standards. The Oxyde Defendants argue for the approach taken by the Third Circuit in *United States v. General Battery Corp.* In that case, the Third Circuit adopted the general common law rule for corporate successor liability, which is essentially non-liability for the acquiring corporation unless one of the four recognized exceptions is met: (1) the purchaser assumes liability; (2) the transaction amounts to a consolidation or merger; (3) the transaction is fraudulent and intended to provide an escape from liability; or (4) the purchasing corporation is a mere continuation of the selling company. *See General Battery Corp.*, 423 F.3d at 305. This approach is consistent with the Supreme Court's decision in *Bestfoods*, which applied the general common law to the question of parent/subsidiary liability under CERCLA. *See Bestfoods*, 524 U.S. at 55, 61–64.

TTSDSC argues for the Court to apply the so-called "continuity of enterprise" theory as laid out by the Fourth Circuit in *United States v. Carolina Transfer Co.*[3] *See Carolina Transfer Co.*, 978 F.2d at 838 (approving the district court's use of the continuity of enterprise theory and laying out the relevant factors). Under the continuity of enterprise theory, also known as the "substantial continuity test," courts look to a series of factors to determine whether one corporation is a successor of another and will thus incur successor liability: (1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities in the same physical location; (4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the successor holds itself out as the

---

[3]However, in *Carolina Transfer Co.* the Fourth Circuit recognized the general common law test as the "settled rule." *Carolina Transfer Co.*, 978 F.2d at 838.

continuation of a previous enterprise.[4]  *See id.* (citations omitted).  However, this approach was recently rejected by the Second Circuit in *New York v. National Service Indus.*, because it is not part of general federal common law and therefore should not be used in accordance with the Supreme Court's reasoning in *Bestfoods*. *See National Service Indus.*, 352 F.3d at 687 (rejecting the continuing enterprise/substantial continuity doctrine as part of the federal common law for CERCLA purposes).

Although the Court believes that the Third Circuit test is the more prudent approach in that it is consistent with current Supreme Court precedent, and that the continuity of enterprise theory has recently been rejected, given the absence of any controlling authority, the facts will be analyzed under both tests.[5]

*A.  General Common Law*

Under the general common law for successor liability, the rule is non-liability for the acquiring corporation unless one of the following four exceptions is met: (1) the purchaser assumes liability; (2) the transaction amounts to a consolidation or merger; (3) the transaction is fraudulent and intended to provide an escape from liability; or (4) the purchasing corporation is a mere continuation of the selling company.  *See General Battery Corp.*, 423 F.3d at 305.  The purchase of the chemicals division by Oxyde Chemicals, B.V. from OMEM does not meet any of the above exceptions, and successor liability cannot be premised under general federal common law.

First, Oxyde Chemicals, B.V. did not assume liability, either expressly or indirectly, for the metals and ores trading business.  The documents concerning the purchase transaction demonstrate

---

[4]This test is separate and distinct from the "mere continuation" exception under the general common law.

[5]The ultimate decision on corporate successor liability under CERCLA is a policy question best-left for the Circuit and beyond the purview of this Court.

that Oxyde Chemicals, B.V. only assumed the on-going trade liabilities of the chemicals division.

There was no assumption by Oxyde of the liabilities of the ores or metals trading business, which had

been responsible for the shipment of the contaminated tin residue.  The metals and ores trading

business was continued by Asoma in its entirety.  At the time of the purchase in 1985, there was no

notice of any CERCLA liability of OMEM.  Additionally, there were no remaining ties between

OMEM and the chemicals division purchased by Oxyde.  TTSDSC has not offered any evidence

raising a question of fact as to this conclusion.

Second, the transaction between OMEM and Oxyde Chemicals, B.V. did not amount to a

consolidation or merger by any stretch of the imagination.  The de facto merger exception has four

elements: (1) continuation of the enterprise by the seller corporation; (2) continuity of the

shareholders; (3) seller corporation ceases its ordinary business operations, liquidates, and dissolves

as soon as legally and practically possible; and (4) the purchasing corporation assumes those

obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business

operations of the seller corporation. *See General Battery Corp.*, 423 F.3d at 305 (citing *Bud Antle,*

*Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1457–58 (11th Cir. 1985)).  None of these requirements

are met in the instant case.  OMEM did not continue the operation of the chemicals division after

Oxyde's purchase.  OMEM sold off its chemicals trading business to an entirely separate entity that

had no previous connection with OMEM, and there was no continuity of the shareholders.  OMEM

did not liquidate or dissolve after the purchase, but instead continued the metals and ores division as

Asoma.  Finally, Oxyde did not assume any of OMEM's obligations related to the metals and ores

division, only the liabilities and obligations of the chemicals division.  Oxyde Chemicals, B.V.

operated as an entirely independent company from Asoma after the 1985 purchase.  TTSDSC has

not offered any evidence that would even suggest the transaction could be viewed as a consolidation or merger.

Third, there is no evidence demonstrating that the 1985 purchase was fraudulent or otherwise intended to provide an escape from liability. There was no knowledge of any potential CERCLA liability at the time of the purchase. TTSDSC has offered no evidence of any fraudulent or improper motives.

Finally, Oxyde Chemicals, B.V. was not a "mere continuation" of OMEM. This exception requires that after the purchase, there exist only a single corporation with the same stock, stockholders and directors between the predecessor and successor corporation. *See National Serv. Indus.*, 352 F.3d at 685 (citations omitted). This test focuses on the ownership of the corporation rather than the continuity of the business. *See id.* The facts demonstrate that this was not the case after the 1985 purchase of the chemicals division by Oxyde. After the purchase, OMEM continued on as Asoma, and continued to operate the ores and metals trading business. There were still two separate corporations after the purchase. There was no commonality of ownership between Asoma and Oxyde Chemicals, B.V., or common directors or stock. Oxyde Chemicals, B.V. was not the "mere continuation" of OMEM. The chemicals division did not continue the work of the ores and metals division, that division was continued on by Asoma.

Under the general common law test for corporate successor liability, the purchase of the chemicals division by Oxyde Chemicals, B.V. does not meet any of the exceptions for liability to apply. Accordingly, Oxyde Chemicals, Inc., a former subsidiary of Oxyde Chemicals, B.V., does not meet any of the exceptions either. The Oxyde Defendants do not possess successor liability for the act of OMEM's metals trading division sending contaminated tin residue to the Tex Tin site from

1974 to 1976 under the general common law test.

### B. Continuity of Enterprise Theory

Likewise, the Court also finds that successor liability cannot be based on the continuity of enterprise theory.  Under the continuity of enterprise theory, courts look to a series of factors to determine whether one corporation is a successor of another: (1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities in the same physical location; (4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the successor holds itself out as the continuation of a previous enterprise. *See Carolina Transformer Co.*, 978 F.2d at 838.

If the question presented was whether Oxyde Chemicals, B.V. is the successor of OMEM's chemicals division, the answer would undoubtedly be "yes."  Oxyde rehired most of OMEM's chemicals division employees after the purchase was completed, including supervisory personnel; it obtained the assets of the chemicals division and continued to use them; it continued to trade in the same chemical products as OMEM; it retained part of OMEM's name by purchasing the rights to use the name "Oxyde"; it essentially continued the business operations of the chemicals division; and finally, Oxyde has held itself out to be a continuation of OMEM's chemicals trading enterprise. However, what TTSDSC fails to demonstrate is that, given the clear separation of the chemicals and metals divisions at OMEM, that Oxyde is the corporate successor to the metals and ores trading business.  It must do so in light of the overwhelming fact that the metals and ores trading division continued as a *separate and independent* entity for over 15 years after the sale of the chemicals division to Oxyde.  TTSDSC cannot premise liability for the conduct of the metals division based upon an arms-length negotiated purchase of the chemicals division without any additional facts.

TTSDSC does offer two facts in support of its theory of successor liability.  First, that Oxyde purchased the rights to use the name "Oxyde."  Second, that on its website Oxyde states that it has "an experience of 50 years in the trading of *chemicals and plastics raw materials*...."  Oxyde's Mot. Ex. I (emphasis added).  As to the purchase of the rights to use *part* of OMEM's name, this is not enough to establish liability.  Especially in light of the complete disconnection between the metals division and the chemicals division.  Next, the statement on the website would lead no reasonable person to believe that Oxyde was the continuing enterprise of the metals and ores trading business of OMEM.  Everything about the transaction, and practically every piece of evidence that TTSDSC claims creates an "issue of fact" hammers home the overwhelming point that the only thing Oxyde purchased was the chemicals division, the only liabilities were for the chemical division, and the only enterprise Oxyde continued was OMEM's chemicals division.

The Court cannot hold in good faith that there is a fact issue as to successor liability in these circumstances under either the general common law for successor liability or the continuity of enterprise test.[6]  The Oxyde Defendants have established as a matter of law that neither one is the successor corporation to OMEM, and that neither one successor liability under CERCLA under either the general common law or the continuing enterprise test.  As such, the Oxyde Defendants' Motion for Summary Judgment is hereby **GRANTED**.

## IV.  Conclusions

Under the facts and circumstances of this case, Defendants Oxyde Chemicals, Inc. and Oxyde Chemicals, B.V. have shown that they lack successor liability and are not the successors in interest

---

[6]The Court notes that it is wary of corporate machinations and shell games designed to allow corporations to escape liability for their conduct, but that situation is not present in the instant case.

to OMEM's metals and ores trading division as a matter of law.  Therefore, the claims of the Tex Tin

Settling Defendants Steering Committee against the Oxyde Defendants must fail as a matter of law.

For these reasons and the reasons stated above, the Oxyde Defendants' Motion for Summary

Judgment is hereby **GRANTED**, and the Tex Tin Settling Defendants Steering Committee's claims

against the Oxyde Defendants are **DISMISSED WITH PREJUDICE**.  Each Party is to bear its own

taxable costs, expenses, and attorneys' fees incurred herein to date.  A Final Judgment on this and all

remaining claims will be issued in due course.

**IT IS SO ORDERED**.

**DONE** this 25th day of April, 2006, at Galveston, Texas.


_____
Samuel B. Kent
United States District Judge