**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| TEX TIN CORPORATION | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-96-247 |
| | § | |
| UNITED STATES OF AMERICA | § | |
| | § | |
| Defendant, | § | |
| | § | |
| | § | Consolidated with |
| | § | |
| TEX TIN SETTLING DEFENDANTS | § | |
| STEERING COMMITTEE, | § | |
| | § | |
| Plaintiffs, | § | CIVIL ACTION NO. G-96-272 |
| | § | |
| GREAT LAKES CARBON | § | |
| CORPORATION; HONEYWELL | § | |
| INTERNATIONAL, INC; BAYER USA, | § | |
| INC.; OXYDE CHEMICALS, INC.; AND | § | |
| TEXAS PETROCHEMICALS | § | |
| CORPORATION, | § | |
| | § | |
| Defendants. | § | |

**ORDER GRANTING DEFENDANT BAYER USA, INC.'S MOTION FOR PARTIAL**
**SUMMARY JUDGMENT**

This lawsuit arises out of the contamination of a large tin smelter site in Texas City, Texas.

The Tex Tin Settling Defendants Steering Committee ("TTSDSC"), the United States, and others paid

for the remediation of the site, and the TTSDSC now seeks contribution from Bayer USA, Inc.

("Bayer"), among others, for the costs paid.  Now before the Court is Bayer's Motion for Partial

1

Summary Judgment.  For the following reasons, Bayer's Motion is **GRANTED**.[1]

**BACKGROUND**

**I.  Factual Background**

This lawsuit arises out of the contamination of a large tin smelter site in Texas City, Texas. TTSDSC now seeks contribution from Bayer, among others, for the costs paid for the remediation and clean-up of the Tex Tin site.  The Tex Tin site includes former metal smelting facilities and areas where materials resulting from the smelting process were disposed of.  From approximately 1941 to 1991, metal smelting operations for tin and other metals occurred there.  The facility was originally built by the United States Government, and it was operated under government contract from 1941 to 1956.  Thereafter it was operated by various private parties.

From 1949 to 1989, the primary product of the Tex Tin facility was tin.  The facility operated as a tin smelter and/or secondary metals recovery plant for nearly 50 years, from 1942 to 1991.  Waste products generated by the smelting operations included ferrous chloride and tin slag.  These liquids were transferred to holding ponds on the Site to the south of the smelting facility.  Other production operations were carried out at the site, including an ammonia-based copper washing process, and a secondary copper smelting process.  The facility also produced ferrous chloride, which was used as a feed material for the production of ferric chloride.  The production of ferric chloride was terminated in 1983, and from then until 1991 ferrous chloride solution was stored in the acid pond on the site.

The EPA first proposed the Tex Tin site for inclusion on the National Priorities List ("NPL") of Federal Superfund Sites on June 24, 1988.  National Priorities List for Uncontrolled Hazardous

---

[1]The Court does not consider this Order worthy of publication.  Accordingly, it has not requested and does not authorize publication.

Waste Sites—Update 7, 53 Fed. Reg. 23988-01, 23992 (June 24, 1988) (Proposed Rule).  On August 30, 1990, the EPA added the Tex Tin site to the NPL.  National Priorities List for Uncontrolled Hazardous Waste Sites, 55 Fed. Reg. 35502-01, 35507 (Aug. 30, 1990) (Final Rule).  On May 11, 1993, the United States Court of Appeals for the District of Columbia Circuit ordered removal of the Tex Tin site from the NPL.  *See Tex Tin Corp. v. U.S. E.P.A.*, 992 F.2d 353 (D.C. Cir. 1993); National Priorities List for Uncontrolled Hazardous Waste Sites, Proposed Rule No. 15, 58 Fed. Reg. 34018-01, 34019 (June 23, 1993) (Proposed Rule).  On June 17, 1996, the Tex Tin site was again proposed for inclusion.  National Priorities List for Uncontrolled Hazardous Waste Sites, Proposed Rule No. 20, 61 Fed. Reg. 30575-01 (June 17, 1996) (Proposed Rule).  On September 18, 1998, the EPA published a final rulemaking listing the Tex Tin site on the NPL.  National Priorities List for Uncontrolled Hazardous Waste Sites, 63 Fed. Reg. 49855-01, 49857 (Sept. 18, 1998) (Final Rule).

## II.  Procedural Background

On May 10, 1996, Amoco brought suit for cost recovery and contribution against the United States and various potentially responsible parties as owners and operators of the Tex Tin site pursuant to 42 U.S.C. §§ 9607 and 9613, styled as *Amoco Chemical Company v. United States of America, et al.*, Civil Action No. G-96-272.  Tex Tin Corporation separately sued the United States and other federal agencies that same month pursuant to 42 U.S.C. § 9613, styled *Tex Tin Corporation, et al. v. United States of America, et al.*, Civil Action No. G-96-247.  The Court consolidated the cases, and efforts to resolve the matter through mediation began in February 1999.  As a result of the mediation, the United States, the State of Texas, members of the TTSDSC, and various other private parties entered into a Consent Decree resolving the claims of the various parties to the consolidated cases.  The Court entered the Consent Decree in August 2000.

Pursuant to the Consent Decree, the TTSDSC engaged in the remediation of the Tex Tin site and incurred costs in association with that remediation. On March 6, 2003, the Court ordered this lawsuit administratively closed. On October 31, 2003, the TTSDSC filed its Amended Third-Party Complaint against Great Lakes Carbon Corporation, Honeywell International, Inc., Bayer, Oxyde Chemicals, Inc., Texas Petrochemicals Corporation, Dow Chemical Company, and Phelps Dodge Corporation, seeking contribution liability for the necessary costs of response incurred in the past, present and future by the TTSDSC for the clean-up of the Tex Tin site within the meaning of 42 U.S.C. § 9601(14) and § 9607(a), and a declaratory judgment on liability and allocable share for response costs in accordance with 42 U.S.C. § 9613(g)(2)(B). Amoco Chemical Company ("Amoco") also seeks to recover independently from the TTSDSC for the costs of the Remedial Investigation/Feasibility Study performed on the Tex Tin site pursuant to the Administrative Order on Consent. On June 24, 2005, Dow and Bayer moved this Court to reopen this lawsuit for the limited purpose of filing motions for summary judgment. On July 15, 2005, this Court reopened the case for discovery related to liability issues and dispositive relief only.

On February 17, 2006, Bayer moved for partial summary judgment on two grounds: (1) that the sale of hydrochloric and nitric acid by Bayer to the operators of the Tex Tin site were sales of a useful product and were not arrangements for disposal of a hazardous substance, and (2) that the claim against Bayer by Amoco related to its affected real property at Operational Unit 2 must fail because the waste disposal at Amoco's property ceased many years before Bayer sold anything to Tex Tin. Both issues will be analyzed in turn.[2]

---

[2]Bayer's Motion for Partial Summary Judgment does not address its potential liability regarding the allegations involving nickel residues and/or spent nickel catalyst.

4

## LEGAL STANDARDS

### I.  Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552–53, 91 L. Ed. 2d 265 (1956).  The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must come forward with "specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  The court must view all evidence in the light most favorable to the non-movant.  *See, e.g.*, *Broussard v. Parish of Orleans*, 318 F.3d 644, 650 (5th Cir. 2003).

If the evidence would permit a reasonable fact finder to find in favor of the non-moving party, summary judgment should not be granted.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252, 106 S. Ct. 2512.  Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact.  *See id.* at 255, 106 S. Ct. at 2513.

### II.  Standard for CERCLA Liability

In 1980, Congress enacted CERCLA "in response to the serious environmental and health risks posed by industrial pollution."  *United States v. Bestfoods*, 524 U.S. 51, 55, 118 S. Ct. 1876, 1881,

141 L. Ed. 2d 43 (1998) (citing *Exxon Corp. v. Hunt*, 475 U.S. 355, 358–59, 106 S. Ct. 1103, 1107–08, 89 L. Ed. 2d 364 (1986)).  CERCLA imposes the costs of the cleanup of hazardous wastes on "*everyone* who is potentially responsible for [the] contamination." *See id.* at 56 n.1, 106 S. Ct. at 1881 (quoting *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 21, 109 S. Ct. 2273, 2285, 105 L. Ed. 2d 1 (1989) (plurality opinion of Brennan, J.) (emphasis in original)).  "In enacting CERCLA, Congress intended 'to facilitate the prompt cleanup of hazardous waste sites and to shift the cost of environmental response from the taxpayers to the parties who benefitted from the wastes that caused the harm." *Burlington N. & Santa Fe Ry. Co. v. Poole Chem. Co.*, 419 F.3d 355, 364 (5th Cir. 2005) (quoting *OHM Remediation Servs. v. Evans Cooperage Co.*, 116 F.3d 1574, 1578 (5th Cir. 1997)).

To recover response costs under CERCLA, the TTSDSC must prove the that: (1) Bayer is within one of the four categories of responsible parties enumerated in 42 U.S.C. § 9607(a); (2) the site or place of disposal is a facility as defined in 42 U.S.C. § 9601(9); (3) there is a release or threatened release of hazardous substances at the facility; (4) the TTSDSC incurred costs responding to the release or threatened release; and (5) the costs and response actions of the TTSDSC conformed to the National Contingency Plan.  *See* 42 U.S.C. § 9607(a).  *See also Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir. 1988); *New York v. Solvent Chemical Co., Inc.*, 225 F. Supp. 2d 270, 277 (W.D.N.Y. 2002).  Once these elements are established, the  defendant is strictly liable unless it successfully invokes one of the statutory defenses provided in 42 U.S.C. § 9607(b).  *See Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 897 (5th Cir. 1993); *Sea Lion, Inc. v. Wall Chemical Corp.*, 974 F. Supp. 589, 598 (S.D. Tex. 1996).

## ANALYSIS

### I.  Disposal of Hydrochloric and Nitric Acid

The TTSDSC alleges that Bayer's predecessor, Mobay Chemical Company, arranged for the disposal or treatment of hydrochloric ("HCL") and nitric acid (among other hazardous substances) at the Tex Tin Site.[3]  Bayer rejects the TTSDSC's claim, arguing that the HCL and nitric acid in question were both useful products sold to Tex Tin and other commercial companies in a commercially reasonable manner.  Bayer further argues that under the terms of the transactions, Bayer had no actual or legal ability to influence or control the use of the acids at the Tex Tin site.  Thus, the Court's inquiry involves two parts.  First, whether Bayer is an arranger under 42 U.S.C. § 9607(a).  Second, whether the sales of HCL and nitric acid constituted sales of useful products.

#### A.  Arranger Liability

"In order to understand the 'useful product' defense asserted by [Bayer], it is necessary to first understand the contours of arranger liability."  *Solvent Chem. Co.*, 225 F. Supp. 2d at 279.  To establish a prima facie case of CERCLA liability, the TTSDSC must establish that Bayer is a responsible party. CERCLA establishes four categories of responsible parties: (1) past owners and operators of facilities that have accepted hazardous waste; (2) present owners and operators; (3) persons who, by contract or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of hazardous substances owned or possessed by such person, at any facility owned or operated by another party and containing such hazardous substances; and (4) transporters of hazardous substances who selected the facility.  42 U.S.C. § 9607(a).  It is the third category, also known as "arranger liability," that is at issue in this case.

---

[3]Bayer is only contesting its potential liability for the sales of HCL and nitric acid.

CERCLA does not define "arranged for," and the Fifth Circuit has declined to provide any bright-line test for the term in the absence of a precise statutory definition. *See Geraghty and Miller, Inc. v. Conoco, Inc.*, 234 F.3d 917, 929 (5th Cir. 2000). Instead, the term "arranger" is to be given a "liberal interpretation." *Id.* (citing *United States v. Aceto Agric. Chems. Corp.*, 872 F.2d 1373, 1380 (8th Cir. 1989)). The terms "disposal" and "treatment" are given the same definition as provided by the Solid Waste Disposal Act, 42 U.S.C. § 9601 (29). The key to these definitions is that "some sort of *waste* is being *discarded*." *Solvent Chem. Co.*, 225 F. Supp. 2d at 279.[4]

The ultimate determination of arranger liability depends on the precise facts and circumstances of each case. *See Freeman v. Glaxo Welcome, Inc.*, 189 F.3d 160, 164 (2d Cir. 1999) (finding that the question whether an arrangement for disposal exists is a fact-specific inquiry). When considering whether a responsible party arranged for the disposal of hazardous material, courts engage in a case-by-case analysis, taking into account the totality of the circumstances to determine whether a sufficient nexus exists between the responsible party and the disposal of the hazardous substance. *See Geraghty and Miller, Inc.*, 234 F.3d at 929; *Sea Lion, Inc.*, 974 F. Supp. at 595. However, there is no precise or even exhaustive list of factors to consider. *See Morton Intern., Inc. v. AE Staley Mfg. Co.*, 343 F.3d 669, 676–77 (3d Cir. 2003) (reviewing decisions from all circuits and assessing that arranger liability is a fact-sensitive inquiry with no agreement on which facts are relevant). Within the Fifth

---

[4]The Solid Waste Disposal Act defines "treatment" as "any method, technique or process including neutralization designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous...[and]...any processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous...." 42 U.S.C. § 6903(34). The Act defines "disposal" as "discharge, injection, dumping, spilling, leaking or placing, of any solid waste or hazardous waste into or on land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

Circuit, courts have considered the following factors: (1) an obligation or authority to exercise control over the disposal of the hazardous substance; (2) ownership of the substance; (3) the intent of the parties to the transaction who decided to place the substance at the facility, e.g., whether the transaction was engaged in for the purpose of waste disposal.  *See Geraghty and Miller, Inc.*, 234 F.3d at 929; *Vine Street LLC v. Keeling*, 362 F. Supp. 754; *Sea Lion, Inc.*, 974 F. Supp. at 595.[5]

## B.  Useful Product Defense

Bayer argues that the HCL and nitric acid sold to Tex Tin constituted useful products, and that it is entitled to rely upon the "useful product" defense to arranger liability.  Similar to arranger liability, there is no precise articulation of this defense by the Fifth Circuit, the Circuit has clearly recognized that   "Congress did not intend CERCLA to target legitimate manufacturers or sellers of useful products."  *Dayton Indep. Sch. Dist. v. U.S. Mineral Products Co.*, 906 F.2d 1059, 1065–66 (5th Cir. 1990).   Therefore, "if the material at issue is 'a useful product, then it [is] not waste and not subject to CERCLA.'"  *Solvent Chem. Corp.*, 225 F. Supp. 2d at 281 (quoting *A & W Smelter and Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1112 (9th Cir. 1998)).   The status of a substance as hazardous does not preclude it also being a useful product.  "Selling hazardous substances as part of a complete useful product does not generally make a party a responsible person.  Neither does selling a useful ingredient in a manufacturing process."  *United States v. Petersen Sand & Gravel, Inc.*, 806 F. Supp. 1346, 1354

---

[5]In *Morton*, the Third Circuit identified ownership/possession, knowledge, and control as the most important factors to consider in the analysis.  *See Morton*, 343 F.3d at 677.  Additionally, the Eleventh Circuit has found the following five factors pertinent: (1) whether the sale involved the transfer of a useful or waste product; (2) whether the party intended to dispose of a substance at the time of the transaction; (3) whether the party made the "crucial decision" to place hazardous substances in the hands of a particular facility; (4) whether the party had knowledge of the disposal; and (5) whether the party owned the hazardous substances.  *Concrete Sales and Servs., Inc. v. Blue Bird Body Co.*, 211 F.3d 1333, 1336–37 (11th Cir. 2000).

9

(N.D. Ill. 1992).

The inquiry as to whether the useful product defense defeats CERCLA liability, like the question of arranger liability, is a fact-specific inquiry. *See Freeman*, 189 F.3d at 164. For example, the characterization of a transaction as a sale does not automatically mean that it is not in fact an arrangement for disposal. *See Morton*, 343 F.3d at 676–77 (instructing that courts need to look beyond a particular defendant's characterization of the transactions at issue); *Cadillac Fairview/California, Inc. v. United States*, 41 F.3d 562, 566 (9th Cir. 1994) ("[A] transaction is not beyond the reach of [arranger liability] simply because it is cast in the form of a sale."); *Dayton Indep. Sch. Dist.*, 906 F.2d at 1065; *Solvent Chem. Co., Inc.*, 225 F. Supp. 2d at 281. On the other hand, in *United States v. American Cyanamid Co., Inc.*, 1997 U.S. Dist. LEXIS 4413 (S.D. W. Va. Jan. 27, 1997), the district court noted that "the useful product defense is not applicable when the product is deemed to be waste and of no further use to the seller and when it can be shown that the seller's motivation was to get rid of the product, even though the buyer makes further use of the product and pays valuable consideration for it." *Id.* at *16. *See also Cooper Industries, Inc. v. Agway, Inc.*, 987 F. Supp. 92 (N.D.N.Y. 1997) (finding that although the scrap steel at issue could be reclaimed or recycled it was the seller's intention to get rid of it and as such the material was deemed "waste" for purposes of CERCLA liability). Oftentimes, "[t]he hard cases occur when a company uses the by-products of its main manufacturing process, or sells them for use by others—*i.e.*, when it uses waste products as the raw material for further processing." *A & W Smelter and Refiners, Inc.*, 146 F.3d at 1112.

## C. Application

### a. HCL

10

HCL is a commodity, and it is listed as a hazardous substance. *See* 40 C.F.R. § 302.4. Bayer's Baytown facility operates three production processes that use HCL and/or chlorine as essential ingredients. The HCL produced for use in the Baytown facility is part of an integrated chemical plant that produces nitric acid, hexamethylene diisocyanate ("HDI"), toulene diisocyanate ("TDI"), and diphenylmethane diisocyanate ("MDI"). HDI, TDI, and MDI are referred to as the isocyanate group, and the production of those products also produces HCL as a co-product in a gaseous anhydrous form.[6] The HCL co-product is then cleaned and processed with water to form liquid HCL. The HCL is generally produced in two concentration ranges: 31–32% and 35–37%. Both types of HCL are used in three different ways at the Baytown facility: (1) as a chemical reactant in other chemical processes at the plant; (2) used in an electrolysis unit that splits the HCL into chlorine and hydrogen, or (3) sold to outside customers. Bayer asserts that HCL is an intended co-product of the isocyanate process, and not a by-product. A "by-product" is defined as "a material that is not one of the primary products of a production process and is not solely or separately produced by the production process." 40 C.F.R. § 261.1(c)(3). However, the term "does not include a co-product that is produced for the general public's use and is ordinarily used in the form it is produced by the process." *Id.*

From 1979 to 1986, Bayer sold approximately 350 million pounds of HCL to its customers. During that same time period, Bayer sold the operators of the Tex Tin site approximately 68–88

---

[6]Both Bayer and the TTSDSC agree that over 90% of the HCL produced in the United States is a by-product or co-product of chlorination reactions. *See* National Emission Standards for Hazardous Air Pollutants: Hydrochloric Acid Production, 66 Fed. Reg. 48,176 (proposed Sept. 18, 2001) (to be codified at 40 C.F.R. pt. 63) ("Only around 5% of HCL is produced via a process where HCL is the primary intended product. Most HCL is produced as a by-product of other processes.").

million pounds of HCL and approximately two million pounds of nitric acid.[7]  The invoice records of the sales reveal that Bayer sold HCL to a wide variety of customers, for a range of prices from .007 cents per pound to .025 cents per pound.  Bayer's sale of HCL occurred in the Houston regional market. The variation in price reflects supply and demand and a variety of other market factors, as well as the fact that some of the contracts were long term and other sales were made on the spot market. Bayer claims that its unique chemical process afforded it flexibility in managing its HCL production because its electrolysis unit allowed the capability of removing chlorine from HCL for direct use in production of other chemicals if it were more profitable to do so, but if the cost of chlorine favored buying chlorine for the manufacture of other products, available HCL could be sold.

The TTSDSC relies almost exclusively on the affidavit of Robert M. Zoch, Jr. ("Zoch"), its expert witness, in its attempt to raise genuine issues of material fact surrounding Bayer's potential liability.  Bayer has moved to strike the Zoch Affidavit on the grounds that: (1) the affidavit is not based on personal knowledge; (2) the affidavit contains opinions outside Mr. Zoch's expertise; (3) the affidavit relies on material not before the Court; and (4) the opinions expressed by Mr. Zoch are not helpful to the Court.[8]  The Court **DENIES** Bayer's Motion to Strike Mr. Zoch's affidavit.  However, even assuming its admissibility and usefulness to the Court, the contents of the affidavit do not alter the Court's conclusions.

The Parties disagree as to whether Bayer's sale of HCL to the operators of the Tex Tin site

---

[7]Although the actual amount of HCL sold is in dispute, the present evidence indicates that the number is far closer to 68 million than 88 million.

[8]Dow also moved to strike Mr. Zoch's Affidavit on those grounds listed above, and on the basis that the affidavit restates inadmissible hearsay and that it does not satisfy the *Daubert* requirements as laid out in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 589 (1993).

constituted sales of a useful product or an arrangement for disposal.  The Court finds that under the relevant factors, Bayer is not an "arranger" under 42 U.S.C. § 9607(a)(3), and that Bayer's sale of HCL constituted the sale of a useful product and not an arrangement for disposal.

### 1.  Control

In the Fifth Circuit, there must be a nexus between the arranger and the authority to control the hazardous waste contained at the particular facility.  *See Geraghty and Miller, Inc.*, 234 F.3d at 928–29.  The Fifth Circuit has adopted the approach of the Second Circuit, describing this nexus as "the *obligation* to exercise control over hazardous waste disposal, and not the mere ability or opportunity to control the disposal."  *Id.* at 929 (quoting *General Electric Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir. 1992) (emphasis in original)).   In this case, there has been no evidence that Bayer had the opportunity to participate in waste-handling decisions at the Tex Tin site, or that it had any ability to control the disposition of the HCL once it was delivered to the Tex Tin site.  Moreover, there is nothing in the record to support the contention that Bayer had the *obligation* to control the disposition of the HCL once it arrived at the Tex Tin site.  Bayer lacks a sufficient nexus with the relevant authority to be held liable as an "arranger" under 42 U.S.C. § 9607(a)(3).

### 2.  Ownership

The next factor for the Court to consider is the ownership of the HCL.  Bayer sold its HCL to the operators of the Tex Tin site "FOB Baytown."  The acid was delivered to trucks belonging to Tex Tin at Bayer's Baytown facility.  Under Texas law, title to goods passes when the seller physically delivers possession of the goods to the buyer.  TEX. BUS. & COM. CODE § 2.401.  Thus, by the time the HCL arrived at the Tex Tin site, it was already in the possession of Tex Tin, and Tex Tin *owned*

the product.

### 3.  Knowledge/Intent

Courts generally consider the intent of the parties, e.g., whether the transaction was engaged in for the purpose of waste disposal, and whether the party had any knowledge of the means of disposal.  There is no evidence supporting the TTSDSC's assertion that Bayer intended to dump its waste at the Tex Tin site, or that it had any specific knowledge as to how the HCL would be used once it arrived at the site.  The TTSDSC relies in large part on statements by Bayer employees that at various times it needed "to move" its HCL.  This alone does not create an intent to engage in a transaction for the purpose of waste disposal.  The TTSDSC has offered no additional evidence demonstrating such an intent, and the Court will not infer such an intent.  The TTSDSC has failed to raise any issues of fact surrounding an intent to dump or the knowledge that the HCL sold by Bayer to Tex Tin would be treated as waste.

### 4.  Useful Product or Waste

The evidence indicates that Tex Tin found HCL to be a useful product.  It used the HCL purchased from Bayer and Dow for ore reduction and ferric chloride production.  Numerous invoices demonstrate that Tex Tin paid valuable consideration for the HCL that it purchased.  Tex Tin only purchased about 20% of Bayer's HCL during the relevant time frame.  There was clearly a market for the HCL, and it was purchased to be used in other manufacturing processes.  The evidence demonstrates that Bayer produced HCL as a co-product of other chemical processes, that it used the HCL it produced internally and sold it to other consumers.  The evidence does not indicate that the HCL at issue was waste, or that Bayer was looking to dispose of it.  *See Solvent Chem. Co.*, 225 F. Supp. 2d at 283.  Bayer has provided sufficient evidence demonstrating that the sales of HCL are

14

properly categorized as sales of a useful product.

### b. Nitric Acid

The TTSDSC makes no persuasive argument nor does it raise any issue of fact indicating that Bayer's sales of nitric acid were anything other than the sale of a useful product. Nitric acid was manufactured at Bayer's Baytown facility, and there is no evidence presently before the Court indicating that the sale of nitric acid to Tex Tin was an "arrangement for disposal."

Overall, the TTSDSC has failed to show that Bayer had actual control over the disposal of HCL or nitric acid at the Tex Tin site, and thus, the ultimate responsibility for its disposal at the Tex Tin site. Instead, it relies upon mischaracterizations and assumptions for its primary arguments. It wants the Court to conclude that almost any HCL produced—whether as a by-product or co-product—is not a useful product. Given the ubiquitous use and presence of HCL in so many manufacturing processes, the Court cannot support that conclusion. Fundamentally, the TTSDSC has failed to produce evidence of dumping or disposal of HCL or nitric acid waste. Bayer sold useful products to Tex Tin, as well as numerous other consumers, during the relevant time period. Traditional market forces—supply and demand—influenced the price of HCL in the regional Houston market. Bayer has demonstrated that its HCL production is part of an integrated, complex process, that is designed to maximize production efficiency and profitability. There is no evidence before the Court that the sales of nitric acid, a product purposefully manufactured by Bayer, were anything other than sales of a useful product.

## II. Amoco Chemical Company's Claim Against Bayer

The Tex Tin Superfund site is broken up into four operable units. The above discussion concerning Bayer's sales of HCL and nitric acid primarily concerns activities that took place (to the

15

extent that the Court has been able to determine) at Operable Unit 1.  Amoco Chemical Company ("Amoco") seeks contribution from Bayer for the entire Tex Tin Superfund site, which includes all of the operable units.  Bayer claims that it can have no liability for the proportionate response costs associated with Operation Unit 2 ("OU 2") because the use of that property for the disposal of Tex Tin waste ceased in 1969, long before Bayer first sold any product to Tex Tin.  Bayer alleges that the release of hazardous waste at OU 2 was solely the act or acts of third parties within the meaning of 42 U.S.C. § 9607(b)(3).  In response, Amoco indicates that it does not seek costs from Bayer associated with the RI/FS done on OU 2, but only those done on OU 1.  It was at OU 1 where Bayer's HCL was used.  Accordingly, Bayer has no liability for response costs associated with OU 2, and to the extent that Amoco's claims can be read as requesting costs for the RI/FS of OUT 2, they are **DISMISSED WITH PREJUDICE**.

## CONCLUSIONS

Under the facts and circumstances of this case, Defendant Bayer USA, Inc. has shown that its sale of HCL and nitric acid to the Tex Tin site constituted the sale of a useful product, and that it lacked actual control over the disposition of those products once they arrived at the Tex Tin site, and therefore it cannot be held liable as an arranger under 42 U.S.C. § 9607(a)(3).  Accordingly, the claims of the TTSDSC and Amoco against Bayer arising out of Bayer's sale of HCL and nitric acid to the operators of the Tex Tin site must fail as a matter of law.  For these reasons and the reasons stated above, Bayer's Motion for Partial Summary Judgment is hereby **GRANTED**.  The TTSDSC  and Amoco's claims against Bayer arising out of the sale of HCL and nitric acid are **DISMISSED WITH PREJUDICE**.  Bayer has no liability for response costs associated with OU 2, and to the extent that Amoco's claims can be read as requesting costs for the RI/FS of OUT 2, they are **DISMISSED**

**WITH PREJUDICE**.  Finally, Bayer's Motion to Strike the Affidavit of Robert Zoch Jr. is **DENIED**.

Each  Party is to bear its own taxable costs, expenses, and attorneys' fees incurred herein to date.  A

Final Judgment on this and all remaining claims will be issued in due course.

**IT IS SO ORDERED**.

**DONE** this 31st day of August, 2006, at Galveston, Texas.

Samuel B. Kent
United States District Judge