IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| TEX TIN CORPORATION | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-96-247 |
| | § | |
| UNITED STATES OF AMERICA | § | |
| | § | |
| Defendant, | § | |
| | § | |
| | § | Consolidated with |
| | § | |
| TEX TIN SETTLING DEFENDANTS STEERING COMMITTEE, | § | |
| | § | |
| Plaintiffs, | § | CIVIL ACTION NO. G-96-272 |
| | § | |
| GREAT LAKES CARBON CORPORATION; HONEYWELL INTERNATIONAL, INC; BAYER USA, INC.; OXYDE CHEMICALS, INC.; AND TEXAS PETROCHEMICALS CORPORATION, | § | |
| | § | |
| Defendants. | § | |

**ORDER GRANTING DEFENDANT DOW CHEMICAL COMPANY'S MOTION FOR SUMMARY JUDGMENT**

This lawsuit arises out of the contamination of a large tin smelter site in Texas City, Texas. The Tex Tin Settling Defendants Steering Committee ("TTSDSC"), the United States, and others paid for the remediation of the site, and the TTSDSC now seeks contribution from Dow Chemical Company ("Dow"), among others, for the costs paid. Now before the Court is Dow's Motion for Summary Judgment. Dow moves for summary judgment on all of the TTSDSC's claims against it.

1

For the following reasons, Dow's Motion is **GRANTED**, and all claims against Dow are hereby **DISMISSED WITH PREJUDICE**.[1]

## BACKGROUND

**I. Factual Background**

This lawsuit arises out of the contamination of a large tin smelter site in Texas City, Texas. TTSDSC now seeks contribution from Dow, among others, for the costs paid for the remediation and clean-up of the Tex Tin site. The Tex Tin site includes former metal smelting facilities and areas where materials resulting from the smelting process were disposed of. From approximately 1941 to 1991, the facility operated as a tin smelter and/or secondary metals recovery plant. The facility was originally built by the United States Government, and it was operated under government contract from 1941 to 1956. Thereafter it was operated by various private parties.

From 1949 to 1989, the primary product of the Tex Tin facility was tin. Waste products generated by the smelting operations included ferrous chloride and tin slag. These liquids were transferred to holding ponds on the Site to the south of the smelting facility. Other production operations were carried out at the site, including an ammonia-based copper washing process, and a secondary copper smelting process. The facility also produced ferrous chloride, which was used as a feed material for the production of ferric chloride. The production of ferric chloride was terminated in 1983, and from then until 1991 ferrous chloride solution was stored in the acid pond on the site.

The EPA first proposed the Tex Tin site for inclusion on the National Priorities List ("NPL") of Federal Superfund Sites on June 24, 1988. National Priorities List for Uncontrolled Hazardous

---

[1] The Court does not consider this Order worthy of publication. Accordingly, it has not requested and does not authorize publication.

Waste Sites—Update 7, 53 Fed. Reg. 23988-01, 23992 (June 24, 1988) (Proposed Rule). On August 30, 1990, the EPA added the Tex Tin site to the NPL. National Priorities List for Uncontrolled Hazardous Waste Sites, 55 Fed. Reg. 35502-01, 35507 (Aug. 30, 1990) (Final Rule). On May 11, 1993, the United States Court of Appeals for the District of Columbia Circuit ordered removal of the Tex Tin site from the NPL. *See Tex Tin Corp. v. U.S. E.P.A.*, 992 F.2d 353 (D.C. Cir. 1993); National Priorities List for Uncontrolled Hazardous Waste Sites, Proposed Rule No. 15, 58 Fed. Reg. 34018-01, 34019 (June 23, 1993) (Proposed Rule). On June 17, 1996, the Tex Tin site was again proposed for inclusion. National Priorities List for Uncontrolled Hazardous Waste Sites, Proposed Rule No. 20, 61 Fed. Reg. 30575-01 (June 17, 1996) (Proposed Rule). On September 18, 1998, the EPA published a final rulemaking listing the Tex Tin site on the NPL. National Priorities List for Uncontrolled Hazardous Waste Sites, 63 Fed. Reg. 49855-01, 49857 (Sept. 18, 1998) (Final Rule).

**II. Procedural Background**

On May 10, 1996, Amoco brought suit for cost recovery and contribution against the United States and various potentially responsible parties as owners and operators of the Tex Tin site pursuant to 42 U.S.C. §§ 9607 and 9613, styled as *Amoco Chemical Company v. United States of America, et al.*, Civil Action No. G-96-272. Tex Tin Corporation separately sued the United States and other federal agencies that same month pursuant to 42 U.S.C. § 9613, styled *Tex Tin Corporation, et al. v. United States of America, et al.*, Civil Action No. G-96-247. The Court consolidated the cases, and efforts to resolve the matter through mediation began in February 1999. As a result of the mediation, the United States, the State of Texas, members of the TTSDSC, and various other private parties entered into a Consent Decree resolving the claims of the various parties to the consolidated cases. The Court entered the Consent Decree in August 2000.

Pursuant to the Consent Decree, the TTSDSC engaged in the remediation of the Tex Tin site and incurred costs in association with that remediation. On March 6, 2003, the Court ordered this lawsuit administratively closed. On October 31, 2003, the TTSDSC filed its Amended Third-Party Complaint against Great Lakes Carbon Corporation, Honeywell International, Inc., Bayer USA, Inc. ("Bayer"), Oxyde Chemicals, Inc., Texas Petrochemicals Corporation, Dow, and Phelps Dodge Corporation, seeking contribution liability for the necessary costs of response incurred in the past, present and future by the TTSDSC for the clean-up of the Tex Tin site within the meaning of 42 U.S.C. § 9601(14) and § 9607(a), and a declaratory judgment on liability and allocable share for response costs in accordance with 42 U.S.C. § 9613(g)(2)(B). On June 24, 2005, Dow and Bayer moved this Court to reopen this lawsuit for the limited purpose of filing motions for summary judgment. On July 15, 2005, this Court reopened the case for discovery related to liability issues and dispositive relief only.

On February 17, 2006, Dow moved for summary judgment on the ground that it sold useful products to the companies that operated the manufacturing facilities at the Tex Tin site, and that such products were used as raw materials by the operators of the site. Additionally, the TTSDSC has alleged liability based on Dow's alleged disposal of magnesium turnings, spent nickel catalyst, and waste cobalt nitrate solution at the Tex Tin Site. Dow argues that the facts surrounding these materials do not support a finding of arranger liability.

## LEGAL STANDARDS

**I. Summary Judgment Standard**

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). *See also Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552–53, 91 L. Ed. 2d 265 (1956). The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. The non-moving party must come forward with "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). The court must view all evidence in the light most favorable to the non-movant. *See, e.g.*, *Broussard v. Parish of Orleans*, 318 F.3d 644, 650 (5th Cir. 2003).

If the evidence would permit a reasonable fact finder to find in favor of the non-moving party, summary judgment should not be granted. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S. Ct. 2512. Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See id.* at 255, 106 S. Ct. at 2513.

## II. Standard for CERCLA Liability

In 1980, Congress enacted CERCLA "in response to the serious environmental and health risks posed by industrial pollution." *United States v. Bestfoods*, 524 U.S. 51, 55, 118 S. Ct. 1876, 1881, 141 L. Ed. 2d 43 (1998) (citing *Exxon Corp. v. Hunt*, 475 U.S. 355, 358–59, 106 S. Ct. 1103, 1107–08, 89 L. Ed. 2d 364 (1986)). CERCLA imposes the costs of the cleanup of hazardous wastes on "*everyone* who is potentially responsible for [the] contamination." *See id.* at 56 n.1, 106 S. Ct. at 1881 (quoting *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 21, 109 S. Ct. 2273, 2285, 105 L. Ed. 2d

1 (1989) (plurality opinion of Brennan, J.) (emphasis in original)). "In enacting CERCLA, Congress intended 'to facilitate the prompt cleanup of hazardous waste sites and to shift the cost of environmental response from the taxpayers to the parties who benefitted from the wastes that caused the harm." *Burlington N. & Santa Fe Ry. Co. v. Poole Chem. Co.*, 419 F.3d 355, 364 (5th Cir. 2005) (quoting *OHM Remediation Servs. v. Evans Cooperage Co.*, 116 F.3d 1574, 1578 (5th Cir. 1997)).

To recover response costs under CERCLA, the TTSDSC must prove the following: (1) that Dow is within one of the four categories of responsible parties enumerated in 42 U.S.C. § 9607(a); (2) the site or place of disposal is a facility as defined in 42 U.S.C. § 9601(9); (3) there is a release or threatened release of hazardous substances at the facility; (4) the TTSDSC incurred costs responding to the release or threatened release; and (5) the costs and response actions of the TTSDSC conformed to the National Contingency Plan. *See* 42 U.S.C. § 9607(a). *See also Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir. 1988); *New York v. Solvent Chemical Co., Inc.*, 225 F. Supp. 2d 270, 277 (W.D.N.Y. 2002). Once these elements are established, the defendant is strictly liable unless it successfully invokes one of the statutory defenses provided in 42 U.S.C. § 9607(b). *See Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 897 (5th Cir. 1993); *Sea Lion, Inc. v. Wall Chemical Corp.*, 974 F. Supp. 589, 598 (S.D. Tex. 1996).

## ANALYSIS

### I. Hydrochloric Acid

The TTSDSC alleges that Dow arranged for the disposal or treatment of hydrochloric acid ("HCL") (among other hazardous substances) at the Tex Tin Site. Dow rejects the TTSDSC's claim, arguing that the HCL was a useful product sold to Tex Tin and other commercial companies in a commercially reasonable manner for value, and that it was used without further processing for its

intended purpose. Thus, the Court's inquiry involves two parts. First, whether Dow is an arranger under 42 U.S.C. § 9607(a). Second, whether the sales of HCL constituted sales of a useful product.

### A. Arranger Liability

"In order to understand the 'useful product' defense asserted by [Dow], it is necessary to first understand the contours of arranger liability." *Solvent Chem. Co.*, 225 F. Supp. 2d at 279. To establish a prima facie case of CERCLA liability, the TTSDSC must establish that Dow is a responsible party. CERCLA establishes four categories of responsible parties: (1) past owners and operators of facilities that have accepted hazardous waste; (2) present owners and operators; (3) persons who, by contract or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of hazardous substances owned or possessed by such person, at any facility owned or operated by another party and containing such hazardous substances; and (4) transporters of hazardous substances who selected the facility. 42 U.S.C. § 9607(a). It is the third category, also known as "arranger liability," that is at issue in this case.

CERCLA does not define "arranged for," and the Fifth Circuit has declined to provide any bright-line test for the term in the absence of a precise statutory definition. *See Geraghty and Miller, Inc. v. Conoco, Inc.*, 234 F.3d 917, 929 (5th Cir. 2000). Instead, the term "arranger" is to be given a "liberal interpretation." *Id.* (citing *United States v. Aceto Agric. Chems. Corp.*, 872 F.2d 1373, 1380 (8th Cir. 1989)). The terms "disposal" and "treatment" are given the same definition as provided by the Solid Waste Disposal Act, 42 U.S.C. § 9601 (29). The key to these definitions is that "some sort of *waste* is being *discarded*." *Solvent Chem. Co.*, 225 F. Supp. 2d at 279.[2]

---

[2]The Solid Waste Disposal Act defines "treatment" as "any method, technique or process including neutralization designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste

The ultimate determination of arranger liability depends on the precise facts and circumstances of each case. *See Freeman v. Glaxo Welcome, Inc.*, 189 F.3d 160, 164 (2d Cir. 1999) (finding that the question whether an arrangement for disposal exists is a fact-specific inquiry). When considering whether a responsible party arranged for the disposal of hazardous material, courts engage in a case-by-case analysis, taking into account the totality of the circumstances to determine whether a sufficient nexus exists between the responsible party and the disposal of the hazardous substance. *See Geraghty and Miller, Inc.*, 234 F.3d at 929; *Sea Lion, Inc.*, 974 F. Supp. at 595. However, there is no precise or even exhaustive list of factors to consider. *See Morton Intern., Inc. v. AE Staley Mfg. Co.*, 343 F.3d 669, 676–77 (3d Cir. 2003) (reviewing decisions from all circuits and assessing that arranger liability is a fact-sensitive inquiry with no agreement on which facts are relevant). Within the Fifth Circuit, courts have considered the following factors: (1) an obligation or authority to exercise control over the disposal of the hazardous substance; (2) ownership of the substance; (3) the intent of the parties to the transaction who decided to place the substance at the facility, e.g., whether the transaction was engaged in for the purpose of waste disposal. *See Geraghty and Miller, Inc.*, 234 F.3d at 929; *Vine Street LLC v. Keeling*, 362 F. Supp. 2d 754; *Sea Lion, Inc.*, 974 F. Supp. at 595.[3]

---

nonhazardous...[and]...any processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous...." 42 U.S.C. § 6903(34). The Act defines "disposal" as "discharge, injection, dumping, spilling, leaking or placing, of any solid waste or hazardous waste into or on land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

[3]In *Morton*, the Third Circuit identified ownership/possession, knowledge, and control as the most important factors to consider in the analysis. *See Morton*, 343 F.3d at 677. Additionally, the Eleventh Circuit has found the following five factors pertinent: (1) whether the sale involved the transfer of a useful or waste product; (2) whether the party intended to dispose of a substance at the time of the transaction; (3) whether the party made the "crucial decision" to place hazardous substances in the hands of a particular facility; (4) whether the party had

B.  **Useful Product Defense**

Dow argues that the HCL sold to Tex Tin constituted a useful product, and that it is entitled to rely upon the "useful product" defense to arranger liability.  Similar to arranger liability, there is no precise articulation of this defense by the Fifth Circuit, the Circuit has clearly recognized that "Congress did not intend CERCLA to target legitimate manufacturers or sellers of useful products." *Dayton Indep. Sch. Dist. v. U.S. Mineral Products Co.*, 906 F.2d 1059, 1065–66 (5th Cir. 1990). Therefore, "if the material at issue is 'a useful product, then it [is] not waste and not subject to CERCLA.'" *Solvent Chem. Corp.*, 225 F. Supp. 2d at 281 (quoting *A & W Smelter and Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1112 (9th Cir. 1998)).  The status of a substance as hazardous does not preclude it also being a useful product.  "Selling hazardous substances as part of a complete useful product does not generally make a party a responsible person.  Neither does selling a useful ingredient in a manufacturing process." *United States v. Petersen Sand & Gravel, Inc.*, 806 F. Supp. 1346, 1354 (N.D. Ill. 1992).

The inquiry as to whether the useful product defense defeats CERCLA liability, like the question of arranger liability, is a fact-specific inquiry. *See Freeman*, 189 F.3d at 164.  For example, the characterization of a transaction as a sale does not automatically mean that it is not in fact an arrangement for disposal. *See Morton*, 343 F.3d at 676–77 (instructing that courts need to look beyond a particular defendant's characterization of the transactions at issue); *Cadillac Fairview/California, Inc. v. United States*, 41 F.3d 562, 566 (9th Cir. 1994) ("[A] transaction is not beyond the reach of [arranger liability] simply because it is cast in the form of a sale."); *Dayton Indep.*

---

knowledge of the disposal; and (5) whether the party owned the hazardous substances. *Concrete Sales and Servs., Inc. v. Blue Bird Body Co.*, 211 F.3d 1333, 1336–37 (11th Cir. 2000).

*Sch. Dist.*, 906 F.2d at 1065; *Solvent Chem. Co., Inc.*, 225 F. Supp. 2d at 281. On the other hand, in *United States v. American Cyanamid Co., Inc.*, 1997 U.S. Dist. LEXIS 4413 (S.D. W. Va. Jan. 27, 1997), the district court noted that "the useful product defense is not applicable when the product is deemed to be waste and of no further use to the seller and when it can be shown that the seller's motivation was to get rid of the product, even though the buyer makes further use of the product and pays valuable consideration for it." *Id.* at *16. *See also Cooper Industries, Inc. v. Agway, Inc.*, 987 F. Supp. 92 (N.D.N.Y. 1997) (finding that although the scrap steel at issue could be reclaimed or recycled it was the seller's intention to get rid of it and as such the material was deemed "waste" for purposes of CERCLA liability). Oftentimes, "[t]he hard cases occur when a company uses the by-products of its main manufacturing process, or sells them for use by others—*i.e.*, when it uses waste products as the raw material for further processing." *A & W Smelter and Refiners, Inc.*, 146 F.3d at 1112.

### C. Application to Dow's Sales of HCL

#### a. HCL

HCL is a commodity, and it is listed as a hazardous substance. *See* 40 C.F.R. § 302.4. However, the EPA has also recognized that HCL, although often produced as a co-product or by-product of other chemical manufacturing processes, is not a waste when it is being used as substitute for a commercial product or raw material. Hazardous Waste Management System, Definition of Solid Waste, 50 Fed. Reg. 614, 619–20 (Jan. 4, 1985) (Final Rule). Dow had contracts to supply commercial strength HCL to the operators of the Tex Tin site from 1967 to 1974. During that same period, Tex Tin also contracted to purchase HCL from Monsanto and GAF. Dow sold HCL of standard commercial strength of 20 and 22 Baume (corresponding to roughly 32% and 36% HCL

respectively), which is sometimes referred to in the chemical industry as muriatic acid. The HCL sold by Dow was not spent, nor was it previously used. Dow produced its HCL by routing anhydrous hydrogen chloride gas produced in connection with Dow's manufacture of other chemical products to an absorber, where it was then combined with purified water, and finally fortified to the required commercial strength for sales purposes. The HCL was then passed through a tower where trace organics were stripped off before the acid was moved to storage for sale.[4]

Dow employed an HCL Marketing Manager and engaged sales personnel who worked out of a number of sales offices, selling HCL to numerous customers. Dow's contracts with the operators of the Tex Tin site for HCL included product specifications, price, and barge delivery terms. The HCL was delivered F.O.B. Dow's plant in Freeport, Texas, where it was then shipped about 50 miles by barge to Texas City, Texas, and then unloaded onto trucks that actually delivered it to the Tex Tin site. At the Tex Tin site, Dow's HCL was used in the production of tin and ferric chloride. The HCL was used in the form delivered by Dow, and it was not reclaimed nor was it required to be processed further to render is useable for its intended purposes.

HCL was one of Dow's many products during this time frame, and sales of HCL constituted only a portion of Dow's overal acid sales. In addition to commercial strength acid, Dow also had

---

[4]Both Dow and the TTSDSC agree that over 90% of the HCL produced in the United States is a by-product or co-product of chlorination reactions. *See* National Emission Standards for Hazardous Air Pollutants: Hydrochloric Acid Production, 66 Fed. Reg. 48,176 (proposed Sept. 18, 2001) (to be codified at 40 C.F.R. pt. 63) ("Only around 5% of HCL is produced via a process where HCL is the primary intended product. Most HCL is produced as a by-product of other processes."). A "by-product" is defined as "a material that is not one of the primary products of a production process and is not solely or separately produced by the production process." 40 C.F.R. § 261.1(c)(3). However, the term "does not include a co-product that is produced for the general public's use and is ordinarily used in the form it is produced by the process." *Id.*


another grade of liquid HCL which it designated as "use acid." The strength and quality of use acid varied considerably, and it was only used for internal production processes. Use acid was never sold to outside customers.

### b. Motion to Strike Affidavit of Robert M. Zoch, Jr.

The TTSDSC relies almost exclusively on the affidavit of Robert M. Zoch, Jr. ("Zoch"), its expert witness, in its attempt to raise genuine issues of material fact surrounding Dow's potential liability. Dow has moved to strike the Zoch Affidavit on the grounds that: (1) the affidavit is not based on personal knowledge; (2) the affidavit restates inadmissible hearsay; (3) Mr. Zoch is not qualified to provide expert testimony on the relevant issues; (4) Mr. Zoch's testimony does not satisfy the does not satisfy the requirements laid out in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 589 (1993); and (5) the opinions expressed by Mr. Zoch are not helpful to the Court.[5] The Court **DENIES** Dow's Motion to Strike Mr. Zoch's affidavit. However, even assuming its admissibility and usefulness to the Court, the contents of the affidavit do not alter the Court's conclusions.

### c. Analysis

The Parties disagree as to whether Dow's sale of HCL to the operators of the Tex Tin site constituted sales of a useful product or an arrangement for disposal. The Court finds that under the relevant factors, Dow is not an "arranger" under 42 U.S.C. § 9607(a)(3), and that Dow's sale of HCL constituted the sale of a useful product and not an arrangement for disposal.

### 1. Control

In the Fifth Circuit, there must be a nexus between the arranger and the authority to control

---

[5]Dow also moved to strike Mr. Zoch's Affidavit on substantially similar grounds. Dow's Motion to Strike was denied for the same reasons.

the hazardous waste contained at the particular facility to support a finding of arranger liability. *See Geraghty and Miller, Inc.*, 234 F.3d at 928–29. The Fifth Circuit has adopted the approach of the Second Circuit, describing this nexus as "the *obligation* to exercise control over hazardous waste disposal, and not the mere ability or opportunity to control the disposal." *Id.* at 929 (quoting *General Electric Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir. 1992) (emphasis in original)).

In this case, there has been no evidence that Dow had the opportunity to participate in waste-handling decisions at the Tex Tin site, or that it had any ability to control the disposition of the HCL once it was delivered to the Tex Tin site. Moreover, there is nothing in the record to support the contention that Dow had the *obligation* to control the disposition of the HCL once it arrived at the Tex Tin site. Dow lacks a sufficient nexus with the relevant authority to be held liable as an "arranger" under 42 U.S.C. § 9607(a)(3).

### 2. Ownership

The next factor for the Court to consider is the ownership of the HCL. Dow sold its HCL to the operators of the Tex Tin site "FOB Dow's plant at Freeport." The was delivered to barges that shipped the HCL to Texas City, where it was then loaded onto trucks for transport to the Tex Tin site. Under Texas law, title to goods passes when the seller physically delivers possession of the goods to the buyer. TEX. BUS. & COM. CODE § 2.401. Thus, by the time the HCL arrived at the Tex Tin site, it was already in the possession of Tex Tin, and Tex Tin *owned* the product, not Dow.

### 3. Knowledge/Intent

Courts generally consider the intent of the parties, e.g., whether the transaction was engaged in for the purpose of waste disposal, and whether the party had any knowledge of the means of disposal. There is no evidence supporting the TTSDSC's assertion that Dow intended to dump its

waste at the Tex Tin site, that it had any specific knowledge as to how the HCL would be used once it arrived at the site, or that the contract for sale of HCL was in fact an arrangement for disposal. The TTSDSC relies in large part on statements by Dow employees that at various times it needed "to move" its HCL. That at certain times Dow would have had excess HCL on its hands, and due to storage limitations or excess market supply would need to "price it to move," without more does not create an intent to engage in a transaction for the purpose of waste disposal. The TTSDSC has failed to raise any issues of fact surrounding an intent to dump or the knowledge that the HCL sold by Dow to Tex Tin would be treated as waste.

### 4. Useful Product or Waste

The evidence indicates that Tex Tin found HCL to be a useful product. It used the HCL purchased from Dow for ore reduction and ferric chloride production. The summary judgment evidence demonstrates that Tex Tin paid valuable consideration for the HCL that it purchased. The evidence establishes a market for the HCL in the Houston region at that time, and that Tex Tin purchased HCL for use in its own chemical and manufacturing processes. The evidence demonstrates that Dow produced HCL as a co-product of other chemical processes, and that it was sold to other customers besides Tex Tin. The evidence does not indicate that the HCL at issue was waste, that it had been used or spent, or that Dow was looking to dispose of it. *See Solvent Chem. Co.*, 225 F. Supp. 2d at 283. Dow has provided sufficient evidence demonstrating that the sales of HCL are properly characterized as sales of a useful product.

Overall, the TTSDSC has failed to show that Dow had actual control over the disposal of HCL at the Tex Tin site, and thus the ultimate responsibility for its disposal at the Tex Tin site. The TTSDSC relies upon mischaracterizations of relevant facts and assumptions for its primary arguments.

It wants the Court to conclude that almost any HCL produces—whether as a by-product or co-product—is not a useful product. Given the ubiquitous use and presence of HCL in so many manufacturing processes, as wells as the EPA's recognition of its usefulness. The Court cannot support that conclusion. Fundamentally, the TTSDSC has failed to produce evidence of dumping or disposal of HCL. Dow sold useful a product to Tex Tin, as well as numerous other consumers. Traditional market forces—supply and demand—influenced the price of HCL in the regional Houston market. Dow has demonstrated that its HCL production is part of an integrated, complex process, that is designed to maximize production efficiency and profitability.

## II. Magnesium Turnings, Spent Nickel Catalyst, and Waste Cobalt Nitrate Solution

In addition to the HCL, the TTSDSC's Amended Complaint alleges that Dow arranged for the disposal of magnesium turnings, spent nickel catalyst, and waste cobalt nitrate solution at the Tex Tin site. Dow argues that the facts regarding these materials provide no support for arranger liability.

### A. Magnesium Turnings

The summary judgment record reflects that Dow sold three 150-lb drums of "primary magnesium turnings, industrial grade" to the Tex Tin site in late 1970 and early 1971. Dow sold primary magnesium in various forms, including extruded sticks, turnings, ingots, and pigs. Dow sold the magnesium to Tex Tin for $0.77/lb., well above the published price of $0.35/lb. at the time. Magnesium turnings do not require further processing for use, and the TTSDSC has failed to produce any evidence showing that the turnings were anything other than a useful product or waste. Magnesium is not listed as a hazardous substance. *See* 40 C.F.R. § 302.4. There is nothing in the record to suggest that liability under CERCLA could be imposed on Dow for its sale of magnesium turnings to the operators of the Tex Tin site.

15

### B. Spent Nickel Catalyst

The TTSDSC alleges that Dow sent spent nickel catalyst to the Tex Tin site. The relevant documents show that in 1976, Dow sold spent nickel catalyst to Gulf Chemical and Metallurgical Corporation ("Gulf") (a predecessor of Tex Tin), and that the nickel catalyst was shipped from Dow's facility in Freeport, Texas, to Gulf's facility in *Freeport, Texas*, and then it was sent to Parkans International, Inc. in Freeport, Texas. The documents do not reflect that any of this spent nickel catalyst made its way to the Tex Tin site in Texas City, Texas.

There is no evidence presently before the Court documenting shipments of spent nickel catalyst to the Tex Tin site by Dow. There are documents indicating that the purchase of spent nickel catalyst by Tex Tin from Dow was contemplated, but there is nothing to show where it arrived (at Tex Tin or another facility owned by the Tex Tin operators) or when. Therefore, there is no basis for imposing liability under CERCLA for the sale of spent nickel catalyst by Dow to the operators of the Tex Tin site.

### C. Cobalt Nitrate Solution

Finally, Dow argues that the only available information on shipments of cobalt nitrate solution confirms that such shipments were sent by *Dow Badische Company*, not Dow Chemical Company. Dow Badische is a separate legal entity from Dow. It was first incorporated in Delaware in 1958. Dow and BASF Overzee N.V. ("BASF") each own equal amounts of stock in Dow Badische, and function as typical shareholders and observe the requisite corporate formalities. Therefore, if Dow is to be held liable for the actions of Dow Badische, the TTSDSC must pierce the corporate veil or it must show that Dow was somehow directly involved. *See United States v. Bestfoods*, 524 U.S. 51, 63–65, 118 S. Ct. 1876, 1885–86, 141 L. Ed. 2d 43 (1998) ("The Court of Appeals was accordingly

16

correct in holding that when (but only when) the corporate veil may be pierced, may a parent corporation be charged with derivative CERCLA liability for its subsidiary's actions.")

At issue here is a shipment of cobalt nitrate solution sent by Dow Badische to the Tex Tin site in 1973. The invoices demonstrate that the shipments came from Dow Badische, rather than Dow. If any liability is to attach, it should be to Dow Badische, unless the corporate veil can be pierced or the TTSDSC can show Dow's direct involvement.

The only evidence offered by TTSDSC in support of its argument that Dow should be held liable for the actions of Dow Badische is that one of Dow's corporate representatives said that Dow Badische was a joint venture between Dow and BASF. Dow Badische's Articles of Incorporation rebut that statement, demonstrating that it was a corporation in its own right. The TTSDSC has put forth no evidence indicating that the requisite corporate formalities were not met, or that the corporate veil should be pierced in this case. Therefore, Dow cannot be held liable under CERCLA for the shipments of cobalt nitrate solution by Dow Badische.

## CONCLUSIONS

Under the facts and circumstances of this case, Defendant Dow Chemical Company has shown that its sale of HCL to the Tex Tin site constituted the sale of a useful product, that it lacked actual control over the disposition of those products once they arrived at the Tex Tin site, and therefore it cannot be held liable as an arranger under 42 U.S.C. § 9607(a)(3). Accordingly, the claims of the TTSDSC against Dow arising out of Dow's sale of HCL to the operators of the Tex Tin site must fail as a matter of law. Additionally, Dow has shown that it cannot be held liable under CERCLA for the sale of magnesium turnings, spent nickel catalyst, or cobalt nitrate solution under the facts and circumstances of this case. For these reasons and the reasons stated above, Dow's Motion for

Summary Judgment is hereby **GRANTED**, and the TTSDSC's claims against Dow arising out of the sale of HCL, magnesium turnings, spent nickel catalyst, and cobalt nitrate solution are **DISMISSED WITH PREJUDICE**. Dow's Motion to Strike the Affidavit of Robert Zoch Jr. is **DENIED**. Each Party is to bear its own taxable costs, expenses, and attorneys' fees incurred herein to date. A Final Judgment on this and all remaining claims will be issued in due course.

**IT IS SO ORDERED**.

**DONE** this 31st day of August, 2006, at Galveston, Texas.

_____
Samuel B. Kent
United States District Judge