**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| TEX TIN SETTLING DEFENDANTS | § | |
| STEERING COMMITTEE, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. G-96-0247 |
| | § | |
| GREAT LAKES CARBON | § | |
| CORPORATION, *et al.*, | § | |
| | § | |
| Defendants. | § | CONSOLIDATED WITH |

| | | |
|---|---|---|
| AMOCO CHEMICAL COMPANY | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. G-96-0272 |
| | § | |
| UNITED STATES OF AMERICA, | § | |
|  *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

In this lawsuit, the parties seek the determination and allocation of financial responsibility for responding to and remediating hazardous substances in a Texas City, Texas site once used as a metal-smelting facility. The Environmental Protection Agency placed the site, known as Tex Tin, on the National Priority List (NPL) for Superfund action in the 1990s. The Tex Tin Settling Defendants Steering Committee (TTSDSC), among others, paid the response and remediation costs. The TTSDSC filed this suit for cost recovery and

contribution against former owners and operators of the facility and more than one hundred potentially responsible individuals and companies, including Bayer USA, Inc.

The pending motion, filed by Bayer, seeks partial summary judgment that it is not liable for response costs under § 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 *et seq.*, because it did not arrange for the disposal of a hazardous substance at Tex Tin. Bayer asserts that it sold a useful product, spent nickel catalyst, to the facility's owner, and that the amount of spent nickel catalyst it sent to Tex Tin was not enough to result in response or remediation costs. The TTSDSC opposes the motion by arguing that there are disputed fact issues material to determining the amount of spent nickel catalyst found during the Tex Tin cleanup and whether the spent nickel catalyst transaction with Bayer was an arrangement for disposing waste or was the sale of a useful product.

Based on a careful review of the motion and response, the reply, the surreply, and the applicable law, this court denies Bayer's motion for summary judgment. The reasons for this ruling are set out in detail below.

## I.    Background

At the outset of World War II, the United States developed a tin-smelting facility in Texas City, Texas. For nearly fifty years, various plant operators conducted metal-smelting operations for tin and other metals. The plant operated under government contract from 1941 to 1956 as the Tin Processing Corporation. In 1957, the United States sold the plant to the Wah Chang Corporation. Teledyne, Inc. purchased Wah Chang in 1967 and one year later

2

sold the facility to the Fred H. Lenway Corporation.  In 1969, Teledyne sold approximately 27 acres of land adjacent to the facility to the Amoco Chemical Company.  In 1970, the Fred H. Lenway Corporation sold the smelting facility to the Gulf Chemical and Metallurgical Company (GCMC), which was subsequently acquired by Associated Metals and Minerals Corporation (AMMC).  In 1984, the smelting facility was renamed the Tex Tin Corporation. The facility operated as a wholly owned subsidiary of AMMC until 1991, when production at the plant stopped.

Several hazardous substances produced at the facility contaminated the site.  The metal-smelting operations generated waste products, including ferrous chloride and tin slag, which were transferred to holding ponds located on the site.  Besides producing tin, the facility produced ferric chloride, using ferrous chloride as feed material.  Tex Tin Corporation injected ferric chloride solution into the ground from 1985, when a deep injection well was installed, until 1987, when the well was plugged.  Other production operations carried out at the site, including an ammonia-based copper washing process and a secondary copper-smelting process, generated wastewater that was treated and discharged, under permit, into the Wah Chang ditch located on the site.

The Tex Tin site was also contaminated by hazardous substances produced elsewhere but deposited there.  During the 1970s, GCMC conducted antimony recovery operations at a facility in Freeport, Texas.  GCMC placed drums containing spent uranium/antimony catalysts in a landfill at Tex Tin.  From 1982 to 1983, GCMC leased the northwest corner of the property to Morchem Resources.  Morchem conducted a waste-oil recovery process at

3

the site and stored waste oil in drums and above-ground storage tanks.  Morchem filed for bankruptcy in the mid-1980s and never removed the waste oil from Tex Tin.

The presence of these hazardous substances caused Tex Tin to be added to the NPL of Superfund sites in 1998.  The Tex Tin Superfund Site consists of four Operable Units. (Docket Entry No. 367, Ex. 1, EPA Record of Decision).   Operable Unit No. 1, encompassing approximately 140 acres, includes the smelting facility, treatment ponds, the Wah Chang ditch, the drums in the landfill, and the above-ground storage tanks.  (*Id.*).  The EPA concluded that given the general dispersal of contaminants across Operable Unit No. 1, that entire Unit is considered an area of contamination.  (*Id.*).

In October 1979, GCMC contracted with Bayer to purchase nickel residues for 50¢/lb of the nickel content.  The nickel residues, known as "Raney nickel," were to be delivered to the Tex Tin site.  (Docket Entry No. 367, Ex. 4, 6).  Bayer used Raney nickel as a catalyst to produce toluene diamine (TDA) intermediate in its toluene diisocyanate (TDI) production unit in Baytown, Texas.  (Docket Entry No. 367, Ex. 4 at 11).  Raney nickel catalyst that was no longer useful to produce TDA and TDI was considered "spent."  In its 1976 Texas Industrial Solid Waste Registration, Bayer identified spent Raney nickel catalyst as a Class I industrial waste and noted its disposition as "Sold For Recovery."  (Docket Entry No. 369, Affidavit of Robert Zoch, Ex. 2, Amendment to Notice of Registration).   Bayer also classified mixtures of dinitiotoluene (DNT), Raney nickel catalyst, and TDA as Class I waste intended for off-site disposal.  (*Id.*).

Under GCMC's contract with Bayer, GCMC was to receive approximately 300,000

pounds of spent Raney nickel catalyst. (Docket Entry No. 367, Ex. 6). The spent catalyst was listed as 60-70% nickel. (*Id.*). An internal GCMC memorandum dated November 1, 1979 stated in relevant part:

> Catalyst Technology will continue delivering nickel residues from Mobay Chemical[1] and putting them in our 40' thickener. Catalyst Technology will also provide the equipment and be responsible for the removal of T.D.A. liquid.
>
> Quantities to be received were estimated to be 30,000 gallons containing approximately 300,000 pounds nickel.
>
> Sampling will take place after all nickel has been received and washed. The final settlement will be based on assay and calculated quantity.
> . . . .
> We are weighing all trucks in and out and holding the tickets in the guard house until the total quantity is received.
> . . . .
> It is felt that after material has been washed it may be possible to pump with O.D.S. to a kiln. Material may be extremely dusty if completely dried so would suggest leaving 8-12% [water] present in material. Dried material should be put in drums and weighed.

(Docket Entry No. 367, Ex. 5). According to GCMC weight tickets, the actual amount of spent nickel catalyst delivered to Tex Tin was 325,470 pounds. (Docket Entry No. 367, Ex. 4 at 3). According to the "Keysheet," an internal GCMC document, all the spent nickel catalyst delivered was placed in the 40-foot "thickener" for water separation and washing. The wastewater containing TDA was to be returned to Bayer. (Docket Entry No. 367, Ex. 7). The record shows that at least some of the washed spent catalyst was dried in a kiln at

---

[1] Bayer was formerly known as Mobay Chemical Corporation.

5

the Tex Tin facility.  It is unclear that all 325,470 pounds was processed or how much of this amount was processed.  It appears that after drying some of the washed spent catalyst, GCMC was left with approximately 43,960 pounds of residue, from which it recovered 25,400 pounds of nickel.  (Docket Entry No. 367, Ex. 9).  In 1980, GCMC placed the nickel in 68 drums and sold them to a company located in Mexico.  (Docket Entry No. 367, Ex. 8). This was the only documented shipment of nickel off the Tex Tin site.  GCMC invited Bayer to invoice GCMC for $12,700 for the transaction.  (Docket Entry No. 367, Ex. 9).

On June 24, 1988, the EPA proposed the Tex Tin site for inclusion on the NPL of Federal Superfund Sites.  The site was added to the NPL on August 30, 1990.  After the Tex Tin Corporation challenged the site's addition to the NPL, the United States Court of Appeals for the District of Columbia Circuit ordered the site removed from the list.  *See Tex Tin Corp v. E.P.A.*, 992 F.2d 353 (D.C. Cir. 1993).  The EPA conducted additional testing and again proposed the Tex Tin site for inclusion in 1996.  That same year, Tex Tin Corporation and Amoco brought separate suits for cost recovery and contribution against the United States and various potentially responsible parties.  The two actions were consolidated.

On September 18, 1998, the EPA again listed the Tex Tin site on the NPL of Federal Superfund Sites.  The parties to the consolidated lawsuits began mediation proceedings in 1999.  Those proceedings resulted in an August 2000 Consent Decree signed by the United States, the State of Texas, the TTSDSC, and other private parties, but did not settle all claims. Acting under the Consent Decree, the TTSDSC incurred response and remediation costs at the Tex Tin site.  On October 31, 2003, the TTSDSC filed an amended third-party complaint

naming seven additional defendants, including Bayer.  The amended complaint alleges that each of these defendants is jointly and severally liable for the TTSDSC's costs.  The complaint asks the court to reallocate the 36% share of the on-site and 25% share of the off-site remediation costs the private defendants contributed under the Consent Decree among all liable private parties, including the seven newly added defendants.

Four of these additional defendants – not including Bayer – entered into tentative settlement agreements with the TTSDSC.  On February 17, 2006, Bayer moved for partial summary judgment on the basis that it was not liable for response costs associated with hydrochloric and nitric acid.  (Docket Entry No. 307).  The district court previously presiding over this case held that Bayer was not liable for these costs because it did not "arrange for disposal or treatment" of hydrochloric or nitric acid at the Tex Tin site, but rather sold a useful product to the Tex Tin Corporation. (Docket Entry No. 329).

The TTSDSC claims that it incurred response costs to investigate, characterize, and remediate the contaminated water and nickel sludge in the 40-foot thickener, to demolish the contaminated thickener and related structures, and to cleanup contaminants that were released from the thickener to the surrounding area.  (Docket Entry No. 369 at ¶ 16).  On June 20, 2008, Bayer filed this motion for partial summary judgment, seeking a ruling that as a matter of law, it is not liable for response or remediation costs associated with the presence of nickel at the Tex Tin site.[2]

---

[2]The relevant summary judgment evidence includes the following: the 1979 contract between GCMC and Bayer (Docket Entry No. 367, Ex. 6); a November 1979 GCMC memorandum (Docket Entry No. 367, Ex. 5); GCMC's Keysheet (Docket Entry No. 367, Ex. 7); a GCMC shipping invoice for the shipment to

## II.     The Governing Legal Standards

### A.     Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "'An issue is material if its resolution could affect the outcome of the action.'"  *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)).  "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response."  *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 471

---

Mexico (Docket Entry No. 367, Ex. 8); a letter from GCMC to Bayer inviting an invoice for nickel recovered by GCMC (Docket Entry No. 367, Ex. 9); the affidavit of Dr. Paul D. Fahrenthold (Docket Entry No. 367, Ex. 4); the affidavit of Robert M. Zoch (Docket Entry No. 369, Ex. 1); and the EPA Record of Decision for Tex Tin Operable Unit No. 1 (Docket Entry No. 367, Ex. 1).

(5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a 'scintilla' of evidence.'" *Little*, 37 F.3d at 1075 (internal citations omitted). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

### B.    CERCLA Liability

Congress enacted CERCLA in 1980 in response to environmental and health dangers posed by property contamination from hazardous substances. *United States v. Bestfoods*, 524 U.S. 51, 55 (1998). The statute was amended by the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99- 499, 100 Stat. 1613. CERCLA's "broad, remedial purpose is to facilitate the prompt cleanup of hazardous waste sites and to shift the cost of environmental response from the taxpayers to the parties who benefitted from the wastes that caused the harm." *OHM Remediation Services v. Evans Cooperage Co., Inc.*, 116 F.3d 1574, 1578 (5th Cir. 1997). Section 107(a)(4) states that "covered persons" are

liable for costs incurred by the federal or state government or Indian tribes in responding to the contamination and for response costs incurred by "any other person." *See* 42 U.S.C. § 9607(a)(4)(A)–(B).  Because the Act imposes strict liability, plaintiffs generally need not prove causation, only that the defendant is a "covered person." *OHM Remediation Services*, 116 F.3d at 1578.  CERCLA does not mandate joint and several liability, but where the harm is indivisible, liability is joint and several.  *Id.* at 1579; *see also In re Bell Petroleum Services, Inc.*, 3 F.3d 889, 895 (5th Cir. 1993).

Section 107(a) allows a plaintiff to recover 100% of its response costs from all liable parties.  42 U.S.C. §§ 9607(a), 9613(g)(2).  Section 9601(25) defines "response" as "remove, removal, remedy, and remedial action."  To recover, a plaintiff must show the following:

> 1. the defendant falls within at least one of the four categories of responsible persons enumerated in 42 U.S.C. § 9607(a);
>
> 2. hazardous substances are disposed at a "facility" as defined in 42 U.S.C. § 9601(9)(B);
>
> 3. there has been a "release" or "threatened release" of hazardous substances from the facility into the environment; and
>
> 4. the plaintiff incurred costs responding to the "release" or "threatened release."

*Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir. 1989).

The four categories of "covered persons" who may be liable for cleanup costs associated with the release or threatened release of hazardous substances are: (1) owners and operators of facilities at which hazardous substances are located; (2) past owners and operators of such facilities at the time that disposal of hazardous substances occurred; (3)

10

persons who arranged for disposal or treatment of hazardous substances; and (4) certain transporters of hazardous substances.  *See* 42 U.S.C. § 9607(a)(1)-(4).  Unless they can invoke a statutory defense or exclusion, covered persons are liable for, *inter alia*, "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan," and "any other necessary costs of response incurred by any other person consistent with the national contingency plan."  42 U.S.C. § 9607(a).

## III.    Analysis

### A.    Bayer's Liability as an "Arranger"

Bayer moved for partial summary judgment that it is not liable for response costs because the usual circumstances involving "arranger" liability are not present.  Bayer argues that it did not arrange for the disposal of waste containing nickel but rather sold GCMC a useful material from which nickel could be recovered.  Bayer argues that because GCMC paid it for the spent Raney nickel catalyst, arranger liability cannot be imposed.

In response, the TTSDSC argues that there are disputed issues material to determining whether Bayer is liable as an "arranger" for costs to remediate spent Raney nickel catalyst at Tex Tin.  The TTSDSC argues that there is a genuine dispute as to whether the transaction involving spent Raney nickel catalyst was the sale of a useful product or an arrangement to dispose or treat a hazardous substance.

Under CERCLA, an "arranger" is a "person who by contract, agreement, or otherwise arranged for disposal or . . . treatment, or arranged with a transporter for disposal or

11

treatment, of hazardous substances owned or possessed by such person. . . ."  42 U.S.C. §

9607(a)(3).[3]  The Fifth Circuit rejects "a bright-line test for determining when one is an

arranger" and liberally interprets the term "arranged."  *Geraghty & Miller*, *Inc. v. Conoco,*

*Inc.*, 234 F.3d 917, 929 (5th Cir. 2000).  "Although arranger liability can attach to persons

that do not have active involvement regarding the timing, manner, or location of disposal,

there must be some nexus between the potentially responsible party and the hazardous

substance." *General Electric Co.* v. *AAMCO Transmissions, Inc*., 962 F.2d 281, 286 (2d Cir.

1992); *see also Geraghty & Miller*, 234 F.3d at 929 (concluding that a nexus must exist that

allows one to be labeled an arranger).  Courts engage "in a case-by-case analysis of arranger

liability, relying upon many factors" to determine whether a sufficient nexus exists.[4]  *Sea*

*Lion, Inc. v. Wall Chem. Corp*., 974 F.Supp. 589, 595 (S.D. Tex.1996).  These factors include

whether the person: (1) intended to engage in a transaction for the purpose of waste disposal;

(2) owned or possessed the waste; (3) had some actual involvement in the decision to dispose

of the waste, or, alternatively had an obligation to control the disposal of the waste; (4)

---

[3] The terms "treatment" and "disposal" are given the same definition in CERCLA as in the Solid Waste Disposal Act, 42 U.S.C. § 6903.  The Act defines "treatment" as "any method, technique, or process, including neutralization designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume.  Such term includes any activity or processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous." *Id.* at § 6903(34).  The Act defines "disposal" as "discharge, injection, dumping, spilling, leaking or placing, of any solid waste or hazardous waste into or on land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." *Id.* at § 6903(3).

[4] The precise standard for arranger liability varies from circuit to circuit and different factors are relied on in each.  *See Morton Intern., Inc. v. A.E. Staley Mfg. Co*., 343 F.3d 669, 676-77 (3d Cir. 2003) (cataloging the varying standards for arranger liability among the circuits).

and/or controlled the waste disposal regardless of whether it owned or possessed the waste. *Vine Street LLC v. Keeling*, 361 F.Supp.2d 600, 606 (E.D. Tex. 2005). No single factor is dispositive; courts determine arranger liability taking into account the totality of the circumstances. *Geraghty & Miller*, 234 F.3d at 929. Whether an arrangement for disposal exists depends on the facts of each case. *Sea Lion*, 974 F.Supp. at 595.

The fact-based inquiry into arranger liability is demonstrated in *Sea Lion*. That case involved a specialty-chemical processing plant seeking to hold a customer liable as an arranger. *Id.* The plant used a "toll processing arrangement" under which the customer supplied raw materials at no charge. The plant used those materials to manufacture a product, which it sold to the customer for a fee. *Id.* at 590. The plant manufactured certain chemicals under this arrangement and the customer refused delivery. *Id.* at 592. These chemicals contaminated the area surrounding the plant. The court concluded that the customer's refusal was evidence that the customer had authority to control disposal of the chemicals and that it intended to dispose of the chemicals at the plant. *Id.* at 597-98. The customer's authority and intent – added to its ownership of the chemicals – created a sufficient nexus between the customer and the disposal of a hazardous substance at the plant to support arranger liability. *Id.* at 595.

In *Vine Street*, the court held that material fact issues remained as to whether a dry-cleaning machine manufacturer was liable as an arranger for chemicals that contaminated a property once used as a dry-cleaning facility. 361 F.Supp.2d at 607. The manufacturer's manuals advised machine operators to dispose of the chemicals into the public sewer. *Id.* at

606. In addition, the operator had no control over the release of chemicals from the machines when they leaked. *Id.* at 607. The court denied defendant's motion for summary judgment because a reasonable fact-finder could conclude that this was an arrangement for disposal of hazardous substances. *Id.*[5]

Arranger liability cannot be imposed on a defendant too far removed from the actual disposal to make decisions arranging for the disposal. *See Edward Hines Lumber Co. v. Vulcan Materials Co.*, 685 F.Supp. 651 (N.D. Ill. 1988), *aff'd*, 861 F.2d 155 (7th Cir. 1988) (defendant did not ultimately decide how chemicals would be disposed); *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313 (11th Cir. 1990) (manufacturer that sold product containing small amounts of hazardous substance not liable as arranger because it was unaware of how substance would be disposed of decades later).

A person may be held liable as an arranger only if the material in question constitutes "waste" rather than a "useful product." *A&W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1112 (9th Cir. 1998). CERCLA was not intended "to target legitimate manufacturers or sellers of useful products," but rather "reflects Congress' desire to hold liable those who would attempt to dispose of hazardous wastes or substances under various deceptive guises

---

[5]After a bench trial on the merits, the court determined that the manufacturer's prior corporate parent was liable as an arranger. *Vine Street LLC v. Keeling*, 460 F.Supp.2d 728 (E.D. Tex. 2006). The court found that the manufacturer exercised control over the disposal of hazardous chemicals because the manufacturer had a "franchise-like" arrangement with the dry-cleaning facility. *Id.* at 746-47. There was evidence that the manufacturer knew its machines would discharge the dry-cleaning chemicals. *Id.* at 747. The court also found that the manufacturer owned or possessed some of the hazardous chemicals because the manufacturer supplied and initially filled the machines with the dry-cleaning chemicals. *Id.* Based on the totality of the circumstances, the court found a sufficient nexus between the manufacturer and the disposal of hazardous waste to impose arranger liability. *Id.*

14

in order to escape liability for their disposal." *Dayton Independent School Dist. v. U.S. Mineral Products*, 906 F.2d 1059, 1065-66 (5th Cir. 1990). "A manufacturer who does nothing more than sell a useful, albeit hazardous product to an end user has neither generated, transported, nor arranged for the disposal of hazardous waste." *City of Merced v. Fields*, 997 F.Supp. 1326, 1332 (E.D. Cal. 1998).

When a defendant characterizes a transaction as a "sale," a court must examine the transaction's actual character to determine whether a statutorily defined disposal or treatment has occurred. *U.S. v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1381 (8th Cir. 1989); *see also United States v. Pesses*, 794 F.Supp. 151, 156 (W.D. Pa. 1992). One factor to consider, not dispositive, is whether the material in question was a principal product or a byproduct of the seller's processes. *California Dept. of Toxic Substances Control v. Alco Pacific, Inc.*, 508 F.3d 930, 938 (9th Cir. 2007); *Catellus Dev. Corp. v. United States*, 34 F.3d 748, 751 (9th Cir. 1994). The fact that the defendant received consideration for a transaction involving its materials is not the test of CERCLA liability. *Pesses*, 794 F.Supp. at 156. The "useful product" defense does not apply when the purpose of a sale is to get rid of or to treat waste. *State of California v. Summer Del Caribe, Inc.*, 821 F.Supp. 574, 581 (N.D. Cal. 1993). Neither does the defense apply when a product's only remaining purpose is to reclaim a material, *Chesapeake and Potomak Telephone Co. of Virginia v. Peck*, 814 F.Supp. 1269, 1275 (E.D. Va. 1992), or when the material could not be used without processing. *Summer Del Caribe, Inc.*, 821 F.Supp. at 581. Companies "have been held liable as arrangers in cases in which they sold materials but knew that the arrangement would effectively dispose of

15

[their] hazardous wastes." *Sea Lion*, 974 F.Supp. at 597.

When a transaction involves used or spent materials containing hazardous substances, courts have found an arrangement for disposal. *Cadillac Fairview/California, Inc. v. United States*, 41 F.3d 562, 565 (9th Cir. 1994). In *Cadillac Fairview*, rubber companies sent contaminated styrene to Dow for redistillation when the styrene became too contaminated to use in producing rubber. *Id.* Dow removed the contaminants and returned the clean styrene to the rubber companies. The court held that "[r]emoval and release of the hazardous substances was not only the inevitable consequence, but the very purpose of the return of the contaminated styrene to Dow." *Id.* at 566. *See also Pesses*, 794 F.Supp. at 156 (scrap metal, titanium, boric acid, and spent batteries); *United States v. A&F Materials Co.*, 582 F.Supp. 842 (S.D. Ill. 1984) (spent aluminum caustic solution); *Chesapeake and Potomak Telephone Co.*, 814 F.Supp. at 1275 (spent lead batteries).

Bayer argues that it is not liable as an arranger because GCMC paid Bayer for the nickel it recovered from the spent nickel catalyst. The TTSDSC claims that the price at which Bayer sold the spent nickel catalyst raises a fact issue as to whether Bayer arranged for the disposal of waste at Tex Tin. Price is one factor to consider in determining whether a transaction was an arrangement for disposal or the sale of a useful product. *Alco Pacific*, 508 F.3d at 938. A material "does not become waste simply because it is inexpensive; [r]ather, it is the de-linking of the price of a substance from the market value of whatever might feasibly be extracted from it that supports a conclusion that a price is nominal and the sale only a disguised disposal." *Id.*

16

Bayer arranged for spent nickel catalyst to be delivered to Tex Tin. The catalyst contained nickel, a hazardous substance under CERCLA. *See* 40 C.F.R. § 302.4. The record shows that Bayer sent 325,470 pounds of material to Tex Tin, but it is unclear how much of this amount was dried. The record only shows that GCMC processed 43,960 pounds of dried spent nickel catalyst to recover 25,400 pounds of nickel. (Docket Entry No. 367, Ex. 9). In 1980, GCMC invited an invoice from Bayer for $12,700. (*Id.*). The average price of nickel in 1980 was $2.96 per pound. (Docket Entry No. 369, Affidavit of Robert Zoch at ¶ 57). The summary judgment record includes undisputed evidence that GCMC paid Bayer 50¢ per pound of the spent nickel catalyst's nickel content. While not dispositive, the fact that Bayer sold the spent nickel catalyst for 16.8% of its market value is one factor supporting Bayer's liability as an arranger for the disposal of waste.

Liability as an arranger requires a "nexus" between Bayer and the disposal of spent Raney nickel catalyst at Tex Tin. There is no evidence in the record that Bayer had the opportunity or authority to control the disposition of the spent Raney nickel catalyst once it was delivered to the Tex Tin site. Nothing in the record suggests that Bayer decided where the spent nickel catalyst would be placed or how it would be treated at Tex Tin. After the spent nickel catalyst was sold to GCMC, Bayer was no longer the owner. Although continuing ownership or control of a hazardous substance is evidence of arranging for disposal, it is not necessary for arranger liability. *Catellus Dev. Corp.*, 34 F.3d at 752. Requiring continuous ownership or control of hazardous substances would make it easy for parties who wanted to dispose of hazardous substances to escape responsibility by going

17

through a sale. *Id.* A person is deemed to satisfy the ownership element of the "arranger" analysis if that person "sold materials but knew that the arrangement would effectively dispose of its hazardous wastes, even though [the person] had relinquished ownership with no intent to receive a finished product containing the materials sold." *Sea Lion*, 974 F.Supp. at 597; *see also Cadillac Fairview*, 41 F.3d at 565 (CERCLA liability extends to persons who have sold and therefore no longer own hazardous substances).

The TTSDSC points to evidence indicating that the purpose of sending the spent Raney nickel catalyst to Tex Tin was to get rid of or treat the waste product. In its 1976 Texas Industrial Solid Waste Registration, Bayer listed the spent Raney nickel catalyst as "waste" and identified its disposition as "Sold for Recovery." (Docket Entry No. 369, Affidavit of Robert Zoch, Ex. 2, Amendment to Notice of Registration). The federal regulations governing waste define a "spent material" as any material that has been used and because of contamination can no longer serve the purpose for which it was produced without reprocessing. 40 C.F.R. § 261.1(c)(1). Spent materials are considered waste if they are "speculatively" accumulated, meaning that less than 75% of the materials generated in any year are recycled. 40 C.F.R. § 261.2(c)(4). The record evidence is undisputed that Bayer used Raney nickel as a catalyst to produce TDA and TDI at its Baytown, Texas facility. Bayer stored the spent Raney nickel catalyst that was no longer useful to produce TDA and TDI in a large tank at its facility. (Docket Entry No. 367). Bayer sold 325,470 pounds of spent nickel catalyst to GCMC. Of that amount, the record only shows that 43,960 pounds (14%) of dried residue was processed by GCMC to recover 25,400 pounds of nickel.

18

CERCLA defines "treatment" to include "any process so as to render waste amenable for recovery or reduced in volume." *See* 42 U.S.C. § 6903(34). The undisputed facts show that Bayer sold spent nickel catalyst to GCMC and that GCMC recovered some nickel.

Bayer argues that the evidence shows that it sold GCMC a valuable product, the recovered nickel. Bayer asserts it did not intend to dispose of the spent nickel catalyst at Tex Tin because Bayer believed that GCMC would recover and sell all the valuable nickel from the spent catalyst. The documents describe the arrangement as calling for Bayer to sell GCMC spent nickel catalyst so that GCMC would process it, recover the nickel, return the wastewater to Bayer, and sell the recovered nickel. The record does not show, however, that any wastewater was returned to Bayer. The record is unclear as to how much of the spent nickel catalyst was actually processed. The TTSDSC points out that only a small amount of the spent nickel catalyst Bayer sold to GCMC is documented as having been processed to recover nickel. (Docket Entry No. 367, Ex. 9). According to the TTSDSC, the $12,700 GCMC paid Bayer in the October 1979 transaction in what is identified as the "final" invoice – and appears to be the only invoice – was to cover Bayer's transportation costs. (Docket Entry No. 369, Affidavit of Robert Zoch at ¶ 57). The TTSDSC asserts that the small amount of nickel recovered and the payment for transportation costs is typical of the "sham sales" transactions that occurred in the 1970s as Texas implemented regulations governing solid waste treatment and disposal. (*Id.*).

The evidence raises a fact issue as to whether Bayer entered into a "sham sale" with GCMC, intending to dispose of the spent material at the Tex Tin site. A reasonable fact-

19

finder could conclude that Bayer sold GCMC spent Raney nickel catalyst, waste material containing a hazardous substance, so that GCMC would treat and dispose of it.  Bayer did not sell spent Raney nickel catalyst as part of its business; rather, Raney nickel catalyst was used in manufacturing two of Bayer's products, TDA and TDI.  Bayer sold the spent Raney nickel catalyst that could no longer be used in manufacturing to GCMC for 16.8% of the market value of nickel.  Although cast in the form of a "sale," a reasonable fact-finder could conclude that Bayer entered the October 1979 transaction with GCMC as an arrangement for the treatment or disposal of a hazardous substance.  Bayer is not entitled to summary judgment on the basis that, as a matter of law, Bayer could not be liable as an arranger.

### B.    The Amount of Nickel at Tex Tin Attributable to Bayer

Bayer argues that even if it is labeled as an arranger, the evidence shows that the amount of nickel at the Tex Tin site attributable to Bayer did not cause the TTSDSC to incur response costs.  Bayer cites *In re Bell Petroleum*, 3 F.3d 889 (5th Cir. 1993), as standing for the proposition that a defendant may escape liability if its waste, even when mixed with other wastes at the site, did not cause response costs.  But the Fifth Circuit did not adopt this standard of liability in *Bell*.  The *Bell* court cited cases from the Second and Third Circuit, *see United States v. Alcan Aluminum Corp. (Alcan-PAS)*, 990 F.2d 711, 722 (2d Cir. 1993)*; United States v. Alcan Aluminum Corp. (Alcan-Butler)*, 964 F.2d 252, 255 (3d Cir. 1992), without deciding whether the standard from those circuits applied in the Fifth Circuit.  *In Re Bell Petroleum*, 3 F.3d at 898-99, 902.

Under the Fifth Circuit rule, "a defendant who seeks to avoid the imposition of joint

and several liability is required to prove the amount of harm it caused." *Id.* at 900. "Whether there is a reasonable basis for apportionment depends on whether there is sufficient evidence from which the court can determine the amount of harm caused by each defendant. If the expert testimony and other evidence establishes a factual basis for making a reasonable estimate that will fairly apportion liability, joint and several liability should not be imposed in the absence of exceptional circumstances." *Id.* at 903. Where the harm is indivisible, all defendants are jointly and severally liable. *OHM Remediation Services*, 116 F.3d at 1579.

Bayer argues that it did not cause harm to Tex Tin because even if all the nickel attributable to Bayer was in fact deposited at Tex Tin, the nickel concentration at the site would still not be high enough to require remediation or removal. Bayer relies on the affidavit of Paul Fahrenthold, Ph.D., designated as an expert witness under Rule 702 of the Federal Rules of Evidence, who reviewed documents relevant to the Tex Tin site. Dr. Fahrenthold found no documentation of the final resting place of 274,600 pounds of spent nickel catalyst.[6] He stated that even assuming, for the purpose of his evaluation, "that the material remained as a solid on-site," (Docket Entry No. 367, Ex. 4, Affidavit of Paul Fahrenthold), the solid nickel residues from the spent catalyst would become a component of the other contaminants in the soil. (*Id.*). Based on the volume of all other contaminants recorded at Operable Unit No. 1 – a total of 113,200,000 pounds – Dr. Fahrenthold

---

[6]Dr. Fahrenthold arrives at the figure of 274,600 pounds of material by subtracting the known shipment of material to Mexico from the total amount of spent nickel catalyst sent to Tex Tin (325,470 - 43,960 = 281,510) and by assuming that the remaining material was 8% liquid (TDA mixed with water) and 92% solid. (Docket Entry No. 367, Ex. 4, Affidavit of Dr. Paul Fahrenthold).

concluded that even if this included 274,600 pounds of nickel, the resulting concentration of nickel in the soil at Operable Unit No. 1 would be 2,426 mg/kg. The EPA's Record of Decision stated that the preliminary remediation goal for nickel was 40,880 mg/kg and that the maximum nickel concentration at Operable Unit No. 1 was 21,764 mg/kg. (Docket Entry No. 367, Ex. 1, EPA Record of Decision). According to Dr. Fahrenthold, the maximum concentration of nickel at Operable Unit No. 1 and the concentration of nickel attributable to Bayer are much lower than the EPA's preliminary remediation goal.

Dr. Fahrenthold stated that instead of being spread throughout the soil of Operable Unit No. 1, an alternative resting place for the spent nickel catalyst is in the holding ponds or the Wah Chang ditch. Assuming this disposition, Dr. Fahrenthold stated that the contribution of nickel to the soil could not be any greater than for the catalyst deposited in the sediment, 2,426 mg/kg.

According to Dr. Fahrenthold, the 2,426 mg/kg of nickel concentration attributable to Bayer under either disposition is much lower than the EPA's remediation goal. Based on his review of the documents and his calculations, Dr. Fahrenthold concluded there is an insufficient quantity of nickel attributable to Bayer at Tex Tin to have contributed to the response costs incurred.

The TTSDSC responds that the final resting place of the spent nickel catalyst Bayer sent to Tex Tin is the 40-foot thickener, rather than spread throughout the soil of Operable Unit No. 1 or in the ponds or ditch, as Dr. Fahrenthold assumes. The GCMC "Keysheet" indicates that the spent nickel catalyst Bayer sent to Tex Tin was placed in the 40-foot

thickener in 1979.  (Docket Entry No. 367, Ex. 7).  The TTSDSC relies on the affidavit of

Robert M. Zoch, the principal technical representative for the Tex Tin PRP group since

October 1998.  (Docket Entry No. 369, Affidavit of Robert Zoch at ¶ 5).  Zoch did not

merely review documents but actually visited the Tex Tin site several times between 1998

and 2001 to investigate the remediation and removal of contaminants.  Zoch's work included

investigating the 40-foot thickener.  He described in his affidavit observing several feet of

solid material remaining inside the thickener, with an aqueous layer above the solids

exhibiting the green tint that is characteristic of nickel compounds.  (*Id.* at ¶ 64).  Zoch stated

that the volume of solids he observed in the thickener was consistent with the 281,500

pounds of spent nickel catalyst he calculated as not accounted for.[7]  (*Id.*).  Subsequent testing

confirmed that the solid material in the 40-foot thickener contained high concentrations of

nickel.  (*Id.*).

Bayer asserts that the material Zoch discovered in the thickener sometime between

1998 and 2001 may not be the spent nickel catalyst Bayer sent to Tex Tin in 1979.  Bayer

asserts that there is no evidence of what  happened to the spent nickel catalyst between 1979

and the time of Zoch's observation.  Nickel was among the many materials recycled  at Tex

Tin beginning in the 1970s.  (Docket Entry No. 369, Affidavit of Robert Zoch).  Bayer

argues that the nickel residue found in the thickener could contain nickel from persons other

---

[7]Zoch reviewed shipping documents and found that the shipment of 43,960 pounds of material to Mexico is the only documented shipment of nickel off of the Tex Tin site.  Because Bayer sent 325,470 pounds of material to Tex Tin, Zoch concluded that 281,500 pounds of Bayer's spent nickel catalyst remained on site.  (Docket Entry No. 369, Ex. 1, Affidavit of Robert Zoch at ¶ 54).

than Bayer.

Zoch's observation and testing of the material in the thickener supports an inference that the material in the 40-foot thickener is the same material Bayer sent to the Tex Tin site in 1979.  But Zoch's affidavit, with other record evidence, raises a fact issue as to the final resting place and concentration of Bayer's spent Raney nickel catalyst at the Tex Tin site.

Bayer argues that even if the material Zoch observed in the 40-foot thickener was in fact the spent nickel catalyst Bayer sent to Tex Tin, Bayer is still not liable as a matter of law because the EPA's Record of Decision did not require a response to nickel at the concentration found.  The maximum concentration of nickel listed in the Record of Decision, 21,764 mg/kg, did not approach the EPA's preliminary remediation goal (PRG) for nickel, 40,880 mg/kg.  Bayer argues that because remediation and removal of nickel was not called for by the EPA's Record of Decision, Bayer is not liable for any such costs incurred by the TTSDSC.

The TTSDSC responds that the nickel concentration in the 40-foot thickener exceeded the EPA's preliminary remediation goal for nickel.  The PRG was 40,880 mg/kg, or a concentration of about 4%.  GCMC's purchase order indicates that the spent Raney nickel catalyst sent to the thickener was 60 to 70% nickel.  (Docket Entry No. 367, Ex. 6).  The record does not show that as a matter of law, Bayer could not be liable for remediation and response costs relating to nickel contamination at the Tex Tin site.

CERCLA liability does not require a contaminant to be listed in the EPA's Record of Decision.  The TTSDSC must show that:  Bayer is an "arranger"; the 40-foot thickener at

24

Tex Tin is a "facility"; there has been a release of a hazardous substance (nickel) from the facility into the environment; and the TTSDSC incurred costs in responding to that release. *Amoco Oil Co.*, 889 F.2d at 668.  Because CERCLA cases are complex, courts often bifurcate liability and damages phases.  *Id.* at 667.  If liability is established, "the court must determine the appropriate remedy and which costs are recoverable.  The court must then ascertain . . . each responsible party's equitable share of the cleanup costs."  *Id.* at 668. Whether a plaintiff was justified in incurring certain response costs is determined at the damages phase and has no bearing on a defendant's CERCLA liability.  *Aviall Services, Inc. v. Cooper Industries, LLC*, 2008 WL 3287095 at *17 (N.D. Tex. Aug. 11, 2008).

If Bayer is found liable, the TTSDSC may recover those response costs that are necessary and consistent with the National Contingency Plan (NCP).  *See Tanglewood East Homeowners v. Charles-Thomas, Inc. et al.*, 849 F.2d 1568, 1574-75 (5th Cir. 1988).  The NCP consists of federal regulations that prescribe the procedure for conducting hazardous substance cleanups under CERCLA and other federal laws.  *See* 42 U.S.C. §9605; 40 C.F.R. Pt. 300.  Under the Fifth Circuit's approach to CERCLA liability, consistency with the NCP is "not an element of CERCLA liability, but a factual issue affecting which response costs [plaintiff] may recover."  *Vine Street LLC*, 460 F.Supp.2d at 759; *Amoco Oil Co.*, 889 F.2d at 668; *see also Aviall Services*, 2008 WL 3287095 at *17.  Bayer cannot avoid liability by asserting that the response costs incurred by the TTSDSC were not authorized by the EPA's Record of Decision.  Bayer is free to argue at the appropriate stage of the litigation that these response costs were inconsistent with the NCP, but the record does not include evidence on

25

that issue.  This argument does not provide a basis to grant Bayer's motion for partial summary judgment.

## IV.    Conclusion

Bayer's motion for partial summary judgment on the basis that it is not liable for response costs incurred by the TTSDSC for remediation and removal of nickel is denied.

SIGNED on September 22, 2008, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge